THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, v. ALEJANDRO DUMAS MÁRQUEZ, Defendant and Appellant.

No. 16226. Submitted December 11, 1957.—Decided April 19, 1961.

*Santos P. Amadeo, Augusto Burgos Mundo,* and *Edgardo Álvarez Quintana* for appellant. *J. B. Fernández Badillo, Acting Secretary of Justice,* and *Arturo Estrella, Fiscal of the Supreme Court,* for appellee.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

Alejandro Dumas Márquez was charged with assault to commit murder in the Superior Court, San Juan Part. He pleaded not guilty and requested trial by jury. After the trial, the jury rendered a unanimous verdict of guilty. Defendant filed a written motion requesting that the former trial and verdict be set aside and a new trial be granted. Said motion was denied and the court rendered judgment imposing on him an indeterminate sentence of two to fifteen years' imprisonment in the penitentiary.

Defendant, feeling aggrieved, appealed from the order denying said motion and from the judgment rendered. He assigns the commission of a single error in the following terms:

"The trial court erred in denying the motion requesting the annulment of the prosecution, verdict, and the sentence in which it was alleged that the defendant had been deprived of his right to a fair trial guaranteed by the Fifth Amendment of the Constitution of the United States and Article II, § 7 of the Constitution of the Commonwealth of Puerto Rico, since the Prosecuting Attorney did not offer defendant's confession as evidence

during the prosecution, but allowed the same to be published in the press."

The controversy in this appeal is limited to the question of whether the motion to set aside the trial and the verdict and to grant a new trial lies. For a better understanding of the facts on which appellant grounded his contention, we copy below the contents of his motion:

"Motion to set aside the trial and the verdict.
"To the Hon. Judge . . . .
"Now comes the defendant and through his undersigned attorneys respectfully alleges, states, and prays:
"1. That on January 7, 1955, the newspaper 'El Imparcial,' No. 8454, vol. 228, published the following information in relation to the defendant. Said information, which is signed by Frank Rodríguez, reporter of 'El Imparcial,' reads as follows:
" 'ASSAILANT OF HATO REY LADY CONFESSES.—*His will broken by the memory of a beautiful woman who fell victim to his brutal assault with a club, Alejandro Dumas, alias "Popeye," and ex jockey, admitted at the very scene of the crime, having assaulted Emma Pujals Quiñones, by letting out on her all the rage which he felt against his father-in-law, Benito Casals, whom he actually intended to assault with the club.*— As "El Imparcial" reported in its Thursday edition, the investigation which was begun since the moment Emma was assaulted, was about to come to a successful end and just as we anticipated, when this edition was in the hands of the public, the arrest which we had announced was taking place.—"Popeye" Dumas' arrest took place in a grocery store of Caparra Heights, where he worked, and it was performed by detectives José Martínez and Leonides Guzmán, who worked under the command of Captain Jorge Camacho, and of the Prosecuting Attorney Ernesto Mieres Calimano. He was immediately taken before Manuel González Seijo, an engineer, who unhesitatingly identified Dumas as the man with whom he had spoken on Saturday night, shortly before the event, and who was carrying a club in his hands.—*Despite González Seijo's identification, ex jockey Dumas insisted in denying the facts; but shortly after he was taken to the scene of the crime, he began to shake all over and started to give an account of all the events which took place on*

*that tragic night, admitting the facts.*—He argued with his father-in-law.—'Dumas started to say that on Saturday night, he and his father-in-law, Casals, had a violent argument at 114 José Martí Street, in Hato Rey, and he avers that he started for the Police Station in order to complain. On the way—according to his testimony—he found a piece of wood with which he armed himself and continued walking around the surroundings of the Espíritu Santo Church. He was trying to decide whether he should go to the Station in order to complain or whether he should return to his father-in-law's house and beat him with the club. He was enraged. *It was then that shortly after 10:00, Dumas saw an elegant lady approaching and he asked her the time. He affirms that the lady (Emma Pujals Quiñones) answered him in a haughty and intemperate tone, that she was not in the habit of telling the time to "a hoodlum," to which Dumas answered that he was no outlaw. Ex jockey Dumas continues to state that there an argument ensued between him and Emma, in the course of which, due to his anger, he struck her with the club. She staggered and screamed, but immediately he struck her a second time, now blind with rage, telling her at the same time: "This is to keep you from screaming." He does not recall whether he continued striking her or not, but he does affirm that as she lay in the street, he picked her up in order to prevent her from being run over by a car, and he dragged her to the empty lot in which she was found.*—"Popeye" continues explaining that afterwards he picked up Emma's handbag, from which he took out some dollar bills. He threw the handbag into the lot where it was found thereafter, and further ahead, behind the Quintana Grocery, he says he tore up the bank bills and threw them away. He affirmed categorically that it was not a matter of theft or anything like it.—*He Suffers from a Mental Derangement.*—Having explained his movements of that night, after the commission of the offense, "Popeye" insisted that his intention was to assault his father-in-law, Benito Casals, and then he disclosed that he has been suffering from a mental affliction for some time, and that due to a lung injury he is being treated in the State Sanatorium. "El Imparcial" verified that "Popeye," in effect, had been confined in the Sanatorium, although it could not verify whether he was receiving psychiatric treatment. Despite the fact that Judge Víctor Parés Collazo charged Dumas with assault with intent to commit mur-

'der and carrying of weapons, fixing a bail of $11,000, some of the investigating authorities do not believe that their work is done for they seem to be concerned about the other individual, not yet found, and who went to the Hato Rey Headquarters, shortly after Emma was assaulted, to inquire about the condition of the victim.—*She is Recovering*.—On the other hand, the Municipal Hospital of Río Piedras informed on Thursday morning that Emma Pujals Quiñones has not yet regained consciousness, but that she has recovered slightly within her serious state. Likewise, it was informed that Dr. Nathaniel Rifkinson, neuro-surgeon of the hospital, has her under close observation. In order to clarify a report to the effect that Emma had been submitted to an operation, Dr. F. A. Battle said that there surely had been a misinterpretation, since what had happened was that the sutures had been performed on the patient, and assured that up to the present Dr. Rifkinson has not even considered the possibility of an operation.' (Pages 3 and 27.)

"2. That on the page of the same newspaper there appears a graphical report with the following caption: 'EX JOCKEY CONFESSES HAVING ASSAULTED LADY.' In said report two photographs appear with the following captions: 'ASSAILANT AND THE WEAPON. *Alejandro Dumas Márquez, alias "Popeye" carries on his shoulders the club which he confesses having used to violently beat Emma Pujals Quiñones on New Year's Day, in Hato Rey*, rendering her unconscious, from which she has not yet recovered. "Popeye" states that his intention was to club his father-in-law, Benito Casals.'—The other photograph has the following caption: 'CONFESSES CRIME.—*Upon being examined by Prosecuting Attorney Mieres Calimano (left) who shows him the club used in assaulting Emma Pujals, ex jockey Alejandro Dumas Márquez confesses his crime at Detective Headquarters in San Juan. Standing, Captain Jorge Camacho, a detective, looks on*.' (Information and another photograph at p. 3.)

"3. That on page 3 of said newspaper, there also appears another photograph with the following caption: 'HE SIGNS CONFESSION.—*Alejandro Dumas (right) signs his confession before Prosecuting Attorney Ernesto Mieres Calimano (left). Captain Jorge Camacho looks on (behind)*.'

"4. That in the newspaper 'El Mundo,' edition of January 6, 1955, No. 13513, final edition, there is a report on the de-

fendant, signed by Enrique Ramírez Brau, reporter of 'El Mundo,' which reads as follows: 'EX JOCKEY ADMITS HAVING CLUBBED EMMA PUJALS.' —'AFTER ASSAULT HE SNATCHED HER PURSE. FLORAL PARK RESIDENT IDENTIFIED HIM YESTER-DAY.—Detectives arrested Alejandro Dumas last night as the author of the assault upon Emma Pujals Quiñones in Floral Park, last Saturday night. *It was reported that Dumas Márquez, an ex jockey, about 30 to 35 years old, admitted the facts after Manuel González Seijo identified him as the individual who had attempted to rob the antenna from his car.* According to the information offered last night, Dumas Márquez, one of the suspects who was being investigated by the Detective, was taken before González Seijo by Captain Jorge Camacho, a detective, who had arrested him. He was taken to the residence of González Seijo, where the latter identified him as the individual who was carrying a club in his hands last Saturday night. González said that he had no doubts that that was the individual to whom he spoke at nine-thirty in the evening, half an hour before Mrs. Pujals was assaulted.—*At the beginning Dumas denied the facts, but shortly afterwards he admitted that he had been the individual who carried the club and the one who had had the incident regarding González' car.* Then Captain Camacho took the accused to the lot where Mrs. Pujals was found. *It was when Dumas saw the place, that he admitted the facts. According to the information offered, here is the account given by Dumas Márquez: After the incident with González, he continued to walk down the street, when he saw Mrs. Pujals, who was walking along the sidewalk. He approached her, and asked her for the time. She answered curtly saying "You insolent thing, no time . . . ." He then struck her with the club and cursed her. When she screamed on account of the blow, he again struck her and exclaimed "stop screaming." When he struck her the second time Emma Pujals fell to the ground and he dragged her to the lot "to prevent a car from running over her."* Dumas then saw the handbag lying on the street, took it and then tossed the club into the yard of the house in front of the empty lot. He continued walking while he searched the handbag. He took the bills which he found, tore them and threw them behind the Quintana Grocery. He then threw the handbag into an empty lot on Guayama Street, where the Quintana Grocery is located.—The handbag was found there

410

the following day by some boys. Dumas was taken by Camacho and other detectives to have him reconstruct the whole line of events from the time he left González Seijo's car, along Ruiz Belvis Street, up to the lot where the assault took place. Afterwards, he kept walking along Guayama Street, turning on an alley, until he walked away from those surroundings. Yesterday, Emma Pujals was still confined in the Municipal Hospital of Río Piedras, without having regained consciousness since Saturday at 10:00 P. M. when she fell victim to Dumas' blows.— Alejandro Dumas was born in Río Piedras. He was arrested at Plaza Provision in Caparra Heights, yesterday at noon, by detectives José Martínez and Leonides Guzmán. The first clue on Dumas Márquez was given by a person who saw the ex-jockey before the incident of the antenna with González Seijo's car, as Dumas, holding a club in his hand, was asking a small boy to go for a walk with him. *Last night, prosecuting attorney Ernesto Mieres Calimano, who has been conducting the investigation since that same Saturday night, was taking sworn statements from Dumas at the Police Station on San Francisco Street in San Juan. As he spoke to the prosecuting attorney, Dumas insisted several times that he had torn the bills but that "it was not a question of money." When speaking to a newspaperman, Dumas admitted that early in the evening he had drunk wine, beer, and rum.'*—(Pp. 1 and 10, Col. 2.)

"5. That in 'El Mundo' newspaper of January 7, 1955, No. 13,515, the following report appears regarding the defendant: 'DUMAS MÁRQUEZ DENIES ROBBERY WAS CAUSE FOR ASSAULT.' *'The capture of jockey Alejandro Dumas Márquez, who is 22 years old and who brutally assaulted Emma Pujals with a club, was the result of* a secret information received by the Detective in the sense that before the incident with Manuel González Seijo, he had been walking with a club in his hands and had asked a small boy to take a walk with him.'—'Corporal José Martínez and detective Leonides Guzmán, having learned Dumas' name followed the clue to find him and arrest him at Plaza Provision in Caparra Heights, where he worked. Víctor Parés Collazo, Night Court Judge, charged Alejandro Dumas Márquez, who admitted the facts, with assault with intent to commit murder and with illegal carrying of weapons, fixing him bails of $10,000, for each count.—*Dumas, alias 'Popeye,' who was arrested last Thursday at noontime, stated that as he*

*was walking along Ruiz Belvis Street in Floral Park, last Saturday at approximately 9:45 in the evening, he approached Emma Pujals Quiñones in order to ask her what time it was. Dumas alleged that Mrs. Pujals answered that she "was not in the habit of giving the time to any hoodlum or outlaw." Then Dumas, according to his own testimony, asked the Pujals lady to excuse him and she answered "I do not excuse any hoodlum or outlaw." It was then that Dumas struck her on the head with the club he was carrying. When she screamed he cursed her and again struck her with the club as she fell to the pavement. Dumas also stated that in order to prevent a car from running over her he dragged her to an empty lot, in front of the Espíritu Santo Church.—He threw the handbag away.*—Dumas stated that he took Emma Pujals' handbag and walked with it to Guayama Street, where he searched it, tore some papers and a bill, throwing the pieces behind the Quintana Grocery, on the same street. He threw the handbag into an empty lot. *Dumas added that the assault was not due to any monetary interest.* In his statement to Prosecuting Attorney Ernesto Mieres Calimano, who questioned him at the San Francisco Street Station, Dumas said that he did not recall what Emma Pujals had been wearing that night. He stated that he had been an official jockey until 1952 and that he had ridden the horses belonging to the stables of Catín Coll Pujols, Miguel Elías, and Mario Mercado. He had been jockey for four years. That he had fallen from a horse called Fajardo, from which he received a blow on his head. Later he fell from a mare, injuring his lung, for which he has received treatment at the Sanatorium where he was once confined. Dumas is married to Carmen Casado, who is four-months pregnant, and they live at 114 José Martí Street, Hato Rey. He gave an account of the incident with Manuel González Seijo about 9 or 9:15 on Saturday evening, on the first day of this month at Duarte Street, corner of Seín Street in Floral Park. Dumas alleges that some youths went to tell González Seijo that he was trying to steal the antenna from his car, which was not true. He said that as he walked zig-zag along the street, he bumped into the vehicle. 'That is what happened' and he added that he was pretty 'tipsy.' He said he had drunk beer, a glass of wine, and a shot of rum.' When he was taken before González Seijo, the latter identified him as the person to whom he had spoken and argued over the antenna affair, and that he had

seen him carrying a club which he described to the Police. Dumas, on the other hand, stated that he had tossed the club among the hibiscus plants at the residence of Carmen Prado de Rodríguez, next to the empty lot where policeman Hernández, from Hato Rey, found it. It was in this empty lot where the Police found Emma Pujals, seriously injured.—*Under Treatment.*— Dumas did not admit the facts immediately after he was arrested, but rather late that night to the agents, Corporal Martínez and Detective Guzmán. Shortly aferwards he was taken to the scene of the crime by Captain Jorge Camacho Torres, where he reconstructed his actions step by step. Captain Camacho Torres seized the blue pants, the *'guayabera'* shirt which Dumas was wearing the night of the crime, and the club with which he assaulted Mrs. Pujals, all of which has been sent to the Police laboratory for analysis. Dumas showed to the Police and to the reporters a certificate from the Sanatorium where he is still receiving medical treatment. He said that he is suffering from nasal hemorrhages. Prosecuting Attorney Ernesto Mieres Calimano, who took the statements of Dumas Márquez and of Manuel González Seijo, an engineer, and at Night Court, told Judge Víctor Parés Collazo that he had not been able to establish that robbery was the motive for the crime but that it was a case of assault to commit murder. Judge Parés then charged Dumas Márquez with assault to commit murder and illegal carrying of weapons, fixing bails of $10,000 and $1,000 on him, respectively. Judge Parés alleged that he regarded the club, in the light of his interpretation of the Penal Code, as a weapon which, like the bludgeon, could seriously harm or cause the death of a person. Defendant was committed in the Princesa jail at 2 in the morning. (Pp. 1 and 10, Col. 3.)

"6. That on the first page of the same newspaper a photograph relating to defendant appears under the following caption: 'Alejandro Dumas Márquez points at the alley connecting Floral Park with Guayama Street and by which he fled after having assaulted Emma Pujals. In the picture there appears Detective José Martínez and Leonides Guzmán, who arrested him, together with nearby residents. (Photograph El Mundo, by Luis Casenave.)'

"7. That on page 4, of the same newspaper, there are three photographs related to the defendant under the following caption: 'Alejandro Dumas shows to detectives how he assaulted

Emma Pujals last Saturday night. In the first photograph, Captain Camacho was questioning Dumas in the lot where the assault was committed, as to the manner in which he handled the club with which he attacked Mrs. Pujals. (2) Dumas Márquez indicates to Captain Camacho how he dragged his victim to the lot after he had clubbed her several times. (3) Dumas indicates how he hid the club among some bushes next to the lot. More information on the first page. (Photograph by El Mundo by Luis de Casenave.)'

"8. That on March 10, 1955, Prosecuting Attorney Ernesto Mieres Calimano filed an information in this Court against defendant charging him with the crime of assault to commit murder.

"9. That on March 11, 1955, the defendant was arraigned and the latter pleaded not guilty and requested trial by jury.

"10. That the trial was held on June 16, 1955, and after the introduction of evidence by the prosecution, the jury found him guilty of the crime with which he was charged.

"11. That during the impanelling of the jury each and everyone of the jurors answered upon being examined by the defense that they had read the reports which the newspapers had published in Puerto Rico in relation to the crime with which defendant was charged.

"12. Defendant alleges that the proceedings followed by him, (sic) as well as the verdict of the jury are null and void for the following reasons:

"A. Because during the investigation of the crime with which this petitioner was charged, the Prosecuting Attorney as well as the Police supplied information to the Press in the sense that petitioner had confessed the crime with which he was charged, and other details of the crime which seriously impaired defendant's constitutional right to a fair trial.

"B. Because the Prosecuting Attorney as well as the Police allowed the Press to take photographs of the defendant as he confessed the crime as well as other photographs related to the crime with which he was charged, thereby depriving him of his right to a fair trial.

"C. That although the Prosecuting Attorney and the Police gave details to the Press regarding the so-called confession of the defendant and although the Press published photographs

of the prosecuting attorney and the defendant in which the latter appeared signing the so-called confession, yet, the prosecuting attorney did not present in evidence, said confession, which was read by the members of the jury who tried the defendant.

"D. When the Prosecuting Attorney did not present defendant's so-called confession in evidence, he was depriving him of his right to a fair trial, since said confession having been read by those persons who were part of the jury, yet, they did not give defendant an opportunity to compel the Prosecuting Attorney to prove that said confession was involuntary (sic) and to present evidence also to the effect that said confession was obtained through physical and moral coercion.

"13. That the foregoing was done in violation of the 5th and 14th Amendments of the Constitution of the United States, as well as of Article II, Section 7 of the Constitution of the Commonwealth of Puerto Rico.

"WHEREFORE, the defendant respectfully prays this Court to set aside the former trial as well as the verdict of the jury and to grant him a new trial."

After the filing of the motion a hearing was held in which defendant offered, and the trial court admitted, various newspaper clippings, the contents of which agree with those inserted in the motion. The decision rendered and appealed from is as follows:

"ORDER.—Defendant in this case was tried by jury and convicted of a crime of assault to commit murder. We are now asked to set aside the trial and the verdict because during the investigation of the crime, information was supplied to the press which the latter published, to the effect that defendant had confessed the crime, and other details of the crime, and that this information was published by the press in reports which are copied in the Motion to Set Aside Judgment, and with photographs in which the defendant appeared signing the alleged confession. In the motion it is alleged, besides, that the Prosecuting Attorney's failure to produce defendant's alleged confession as evidence, deprived him of a fair trial and that all the acts of publicity violate the 5th and 14th Amendments of the

Constitution the United States and Article II, Section 7 of the Constitution of the Commonwealth of Puerto Rico.

"At the trial, and when the jury was impanelled, the latter was freely asked whether it had formed a judgment and whether it had read the reports of the press in relation to the case. All the jurors who remained and who formed part of the panel which sat at the trial stated that, despite what they had read in the papers, they were capable of rendering a fair judgment.

"The Prosecuting Attorney offered testimony of eyewitnesses, such as the victim herself, and other witnesses who saw the defendant near the scene of the crime and who testified besides as to certain details and facts. The Prosecuting Attorney did not present defendant's confession in evidence. If he had it, he deemed it wise not to offer the same. Perhaps, in order to avoid arguing any question which defendant might raise regarding the publicity which said confession had received in the press. Defendant did not present any theory or evidence of any kind whatsoever.

"There is no doubt that the newspaper reports may affect the jurors and even the judge presiding the trial to such an extent as to render him incapable of deciding the issues at bar and of guaranteeing to defendant a fair trial.

"Whether the jurors who took cognizance of this case lied in stating that despite the press reports, they were capable of rendering a fair judgment, is a matter which we can not decide, because such a question is not before us, nor is there any evidence to that effect. We must, therefore, admit that the jury was fair in their weighing of the evidence, especially when we consider that defendant did not offer any evidence and the case was heard solely on the evidence for the prosecution, which was incriminating.

"If the Prosecuting Attorney and the Police gave the press information about defendant's confession and other facts and details of the crime while the latter was still being investigated, it has already been decided by Our Honorable Supreme Court that this constitutes poor practice. If on the contrary, neither the Prosecuting Attorney nor the Police gave the press information, but the latter found out and published facts or conjectures in relation to criminal acts which undoubtedly were of public interest, we do not see how this could have been avoided in view of the constitutional right of freedom of the press.

"In view of the foregoing, the motion requesting that the trial and the verdict be set aside shall be denied and a date shall be set for pronouncing sentence."

The issue at bar is whether the publicity given by the press of the details of the crime and of appellant's alleged confession and the Prosecuting Attorney's failure to offer the same in evidence at the jury trial, really deprived defendant of his constitutional right to the due process of law or whether, on the contrary, he fully enjoyed during every phase of the trial, all the privileges and guarantees sanctioned by the Constitution of the United States and of Puerto Rico.

In the first place, we shall clearly and objectively state all the facts and findings appearing in the record subsequent to defendant's arrest and to the reports published by the press.—Those in relation to the commission of the offense charged and those which took place thereafter until the filing of the information appear in the summary of the evidence which is copied hereafter.—Later we shall discuss the issue raised.

I

On March 10, 1955 the prosecuting attorney filed in the Superior Court, San Juan Part, an information against Alejandro Dumas Márquez charging him with assault to commit murder, and alleging that said offense was committed as follows:

"The above-mentioned Alejandro Dumas Márquez, on or about January 1, 1955 in Hato Rey, Río Piedras, Puerto Rico, which forms part of the Superior Court of Puerto Rico, San Juan Part, unlawfully, wilfully, with malice aforethought, deliberately and with a firm intent to kill, assaulted and battered with a piece of wood Emma Pujals Quiñones, a human being, inflicting various contusions of a serious nature on her with the intent then and there, to commit murder."

On the back thereof there is a list of fifteen witnesses with their corresponding addresses. By motion filed by the

prosecuting attorney on March 23, the name of Emma Pujals Quiñones as well as her address was added to that list neither of which appeared in the original list.

The defendant was arraigned on the 17th of that same month of March and was represented by his two attorneys, who pleaded not guilty and requested trial by jury, which was set for the following May 23. On April 4 defendant gave a provisional bail and was released from jail. He never prayed for change of venue.

On May 23, when the case was called for trial, his two attorneys moved for a continuance "because they were not ready since they still had to locate certain witnesses." The court granted the continuance and set the trial once again for June 16, 1955.

By motions filed on May 17 and June 6 and 14, his attorneys requested and obtained subpoenas for Ismael Dumas Márquez, Miguel Angel Ortiz, Eugenio Enrique Toro Calero and Justo Enrique Colón as their "essential witnesses for their defense."

## II

The trial commenced on the morning of the day for which it had been finally set, June 16, 1955, and ended the next day. The People was represented by the same prosecuting attorney who investigated the case and defendant by his two attorneys. When called for trial "The parties declared that they were ready for trial, and the Court ordered the impanelling of the jury . . . ."—t. 1.

Twenty-one persons were summoned for the impanelling of the jury. Of them two were challenged for cause, six were challenged peremptorily by the defense, and one by the prosecuting attorney.

What follows is a summary of the *voir dire* examination of each person questioned during the selection of the jury which finally tried the case. We shall identify them by means

of their initials. We shall textually quote in part their answers.

When it was the turn of counsel for the defense to challenge for cause in a general way, he asked the twelve persons who had originally occupied the jury box, whether any of them had been informed as to the facts of the case, prior to the day when the trial started. The following general answer appears in the record: "By the press." But when they were immediately asked "which members of the jury have become acquainted with these facts through the press?" only the following jurors answered in the affirmative: A.R., J.M.R. and J.R.M.—t. 2–3.

When J.M.R. was asked by Burgos Mundo, counsel for the defense, he stated: That he read "something in relation to the facts of this case"; it was the first time this information was made public, he did not form an opinion as to the case; it impressed him as "a general information, as any piece of news," he was not prejudiced by the fact that the victim of the assault was a woman; he ignores how the events occurred; he read "the most important part: the caption, and a little more"; he does not know Emma Pujals; he does not remember having seen any photographs in relation to the case; he did not form a judgment as to the same; he had not been impressed by the wave of burglary and theft in Puerto Rico, "because it is a natural thing to read in the press about thefts, murders and all that"; he is capable of judging the case exclusively on the evidence introduced; that in his case it would all depend on the testimony of the witnesses; if the evidence presented by the prosecuting attorney showed that defendant was not guilty, he would not be influenced by the additional fact that defendant did not offer evidence to defend himself, and that he would convict or acquit him "according to the evidence presented by the prosecuting attorney." "Sometimes the evidence itself (the prosecuting at-

torney's) favors the defendant"; in case of doubt, the doubt always favors defendant; he is 54 years old.—t. 3–5.

This person was a member of the jury at the trial.

Upon being examined by counsel for the defense, J.R.M. answered: He thinks that he read the facts of this case in the press; two or three times; he does not recall having seen photographs in the press in relation to the case, but he knows that he read "the first report, when the assault on the lady was first published"; he did not know the defendant nor the lady; he did not discuss the news with anyone; he did not form a judgment, he read "the news as he would any other piece of news"; he is not in the habit of forming judgment as to the statements in the press; "one reads a report and learns about the event, but as to myself, I do not reach conclusions since the newspaperman who furnishes the information is subject to hearsay, and he may be stating something that is not true, but he is giving the news in good faith, and then one is not going to decide just by reading a newspaper the opinion regarding a case"; one is going to judge a citizen who has had an interview with a newspaperman and comes to court to defend himself, we are not to judge him by what he has said to the newspaperman, but rather by the evidence presented here in court."—t. 5–7.

This juror also acted in the trial.

J.G.C. When examined by counsel for the defense: He read the caption regarding the information in the newspaper; he did not read it wholly; he did not form a judgment from the caption; he does not know Mrs. Pujals or Olga Calzada, nor José Díaz Hernández, Manuel González Seijo, Antonio Rosario, Petra Quiñones Pujals, Lieutenant José A. Rivera, Rafael Santiago Carmona, Captain Jorge Camacho, Corporal José Martínez, Sergeant Francisco, Captain A. Palmer López.—t. 5–8.

When all the jurors were asked in general whether any of them knew the afore-mentioned persons, only juror Juan R. Molina, answered: "I know who Captain Camacho is, and Ramírez Brau, and I know González Seijo."—t. 8.

In his turn to challenge for cause, the only question which the prosecuting attorney asked was "Are the ladies and gentlemen of the jury ready to judge the facts solely on the evidence presented and admitted in this case?" There was no negative answer. The defense, at that moment, challenged four jurors peremptorily. The clerk completed the panel of jurors, and once again it was the turn for counsel for the defense to challenge for cause regarding the four new jurors summoned.—T. 9–10.

R. M. widow of M.—Upon being examined by counsel for the defense, answered: That she read the headlines of the reports on the case appearing in the newspaper; she did not comment it with anyone; the fact that a woman was involved in the case would not influence her at all; she is 51 years old.

This lady was challenged peremptorily by counsel for the defense.—t. 10.

E.R.R.—When questioned by counsel for the defense, answered: That she did not read any report on the case; she does not know the witnesses who appear on the back of the information; she does not know Emma Pujals, nor her relatives.—t. 11.

This lady was also challenged peremptorily by counsel for the defense, exhausting thereby his six peremptory challenges. Section 223 of the Code of Criminal Procedure.

J.R.M.—Upon being examined by counsel for the defense, answered: That he read something in the newspaper in relation to the case, he read various reports but did not form a judgment as to the case.—t. 11.

This gentleman, whose name is José Rivera Mundo, was challenged peremptorily by the prosecuting attorney.—t. 11.

Four other persons were summoned to complete the panel of jurors.

M.F.M.—This lady answered to the questions of counsel for the defense: That she was 49 years old; that she was in New York when the events took place; she learned something about the case through "El Diario de Nueva York"; she only read the caption "about the case of this man who had clubbed a lady"; she does not know Emma Pujals or any of her relatives; that the fact that she read "what she read" should not influence her in judging the case, although she "would try" to weigh the evidence presented; her frame of mind would be set against defendant because a lady is involved in the case.—t. 13.

Counsel for the defense then challenged her for cause. The judge asked this lady if because of the sole fact that the victim was a woman, she would find defendant more guilty, and she answered: "Certainly I would find him more guilty." —t. 14.

This challenge for cause was sustained.

G.N.A.—Answered to questions of counsel for the defense: That he carries on his business in San Juan, he does not know Emma Pujals or any of her relatives; he would judge the case wholly impartially despite the fact that a woman is involved in the case; he read reports on the case "the day when the news came out"; thereafter he read nothing more; he read it "as I usually read all the news in the paper, without passing judgments over anything"; although it was a crime against the life of an individual he did not become particularly interested in the case because he could not know "if the person who committed the crime was guilty"; and that "it is impossible to know that until the whole case is heard;" that this does not mean until the paper gives all information, but "until defendant sits here and all the evidence is presented, that of the defense as well as of The People;" has not formed a previous judgment because of the fact that he had read

about the case previously; he shall form his judgment when the case ends; if defendant is convicted "it is then I believe he is guilty"; when he comes to act as a juror he is ready to make a sacrifice for the State and when they call him it is because they need him; although he is attending to his business, when he gets away from it (to act as a juror) he is willing to comply with the duty which is imposed on him and he does not think that this could harm his business in any way.—t. 14–16.

This gentleman formed part of the jury which tried the case.

J.V.O.A.—Upon being examined by counsel for the defense, he answered: That he did not read anything (press reports) in relation to the facts of the case on trial; he was in the country at the time and read nothing; he receives the paper in the country, but not always; at the time of the events he did not receive it and he does not recall having read the paper at the time; he does not know when the events took place; he has been a juror for two years; he was acting as a juror on January 1, 1955; sometimes he did not read the Papers for three, four and even five days; he lives in the "Gloria" ward, at Trujillo Alto; he would act in accordance with the evidence and although a woman was involved in the case this would not influence his mind; if defendant proved he was not guilty, "that is all right with me." When counsel for the defense asked him whether in the event that the prosecuting attorney did not prove defendant's guilt beyond a reasonable doubt, would the defendant have to present (to the jury) evidence to prove that he is not guilty, he answered in the affirmative; and when he was asked how he would act if defendant submitted the case on the evidence of the prosecuting attorney, he answered: "He shall have to prove somehow that he is not guilty," and in the event that it was not proved that he was innocent he would convict him "of course."—t. 16–18.

Counsel for the defense challenged this juror for cause. The prosecuting attorney did not object. The court sustained the challenge for cause.—t. 18.

A. V.—When examined by counsel for the defense, he answered: That he had read the facts of the case in the newspaper "El Mundo"; "just the caption"; he did not form judgment as to the facts; he did not read any information whatsoever in relation to defendant; and he repeats that he only read "the caption" of the report published by "El Mundo." Then the defense asked: "Have you read anything in relation to defendant's alleged confession?" And he answered: "No, sir." When he is asked what did he read in the papers, he answered "that a lady was struck with a crossbar," that he did not follow the case through the press every day because he does not have time, he has things to do, he is the secretary of a corporation and he has business to attend to; at lunch time he reads the papers, the first time he read "the papers in relation to the facts of the case; he saw a photograph in the newspaper; he looked over "the news; he does not recall which photograph he saw; he might have seen it but he does not remember; he does not recall when he read the information because what he read was the caption, as he had previously stated; he would not be influenced by the fact that a woman was involved in the case. —t. 19–21.

This gentleman was also a member of the jury.

While this juror was being examined the following took place:

"(Counsel for defendant)—'Do you read the newspaper every day?

—Well, I do not remember.

—Then you may possibly have seen a photograph published in relation to this case?

—It could be; but I really do not remember.

—Specifically as to January 4, when this information appeared for the first time, did you read said information?

—I don't know whether it was on that day . . . .

—Examine this.

"Prosecuting Attorney: Your Honor, that can not be done.

"Judge: Sustained.

"Counsel for defendant: *It was in order to show the juror a newspaper report.*

"Judge: You may not do it; objection sustained.

. . . . . . .

"Counsel for defendant (Dr. Amadeo): Your Honor, we object to your ruling when my colleague *tried to show the juror the newspaper reports.*

"Judge: What was being shown?

"Counsel for defendant: *The photograph.*

"Judge: Now you may show it to him. Now, if the colleagues wish, when it is the turn of the Defense to present evidence they may also show the publication; present it, I mean. As you wish.

"Counsel for defendant: All right, Your Honor.

"Judge: The gentlemen of the jury who were recently called, please take the final oath."—t. 21–22. (Italics ours.)

Thus the jury was finally impanelled and seven of its members (M.O., M.I., J.A., L.M., A.R.D., E.A., and J.G.G.) *were not questioned in any way whatsoever by neither the counsel for the defense nor by the prosecuting attorney.* They were not even asked whether they had seen or read the headlines.

### III

Then the period for the presentation of the evidence started. The prosecuting attorney offered the testimony of five of the sixteen witnesses summoned by him, placing the other witnesses at defendant's disposition.—t. 83. The People offered as physical or material evidence, which was admitted without the objection of counsel for the defense, seven X-ray photographs taken of the victim (Exhibit 1, t. 34) and the "piece of wood" (Exhibit 2, t. 83) identified by witnesses Manuel González Seijo—t. 65—and Francisco A. Orona—t. 74—as the instrument used by defendant in committing the

crime and the stains on it which were analyzed by Rafael Santiago Carmona, an expert.—t. 76–78.

When the prosecuting attorney finished presenting his evidence, counsel for the defense requested a continuance of the trial until the next day, June 17, because one of his witnesses was not present. The court granted the continuance and subpoenaed the witness. Next morning the session was resumed and the case was called for trial to continue defendant's turn to present the evidence. At that moment his attorneys told the court: "Your Honor, we are going to submit our case *on the evidence presented by the prosecuting attorney.*" When the judge asked whether the defense was going to state its theory, the attorneys answered: "No, Your Honor. We submit the case."—t. 85–86. The instructions to the jury followed.

IV

The evidence presented to the jury, and which it considered, was correctly summarized by the judge in his instructions, as follows:

"The evidence of the prosecuting attorney consisted first, in the testimony of Dr. Ismael Ruiz, who testified that he works in the Municipal Hospital of Río Piedras and in the School of Medicine; that he is a surgeon; that on January 1, 1955 he was in the Río Piedras Hospital and treated Emma Pujals Quiñones about eleven thirty at night; that the latter, after having been examined by him, showed various wounds on her head, a deep contusion of a triangular shape in the occipital region, six inches by four, a deep laceration in the middle parietal region and another deep laceration in the front-parietal region, which was two inches long—a total of three wounds on the head. That she was in a state of shock due to the loss of blood and low blood pressure, and she was unconscious; and that he treated her until March 13, 1955, the patient having remained unconscious for two weeks. The witness showed the ladies and gentlemen of the jury the location of the wounds described by him on the body of Emma Pujals, stating that she also had a contusion on her shoulder, her elbow and left hand with acute

ecchymosis, which he explained was an effusion of blood in the tissues; that the three wounds showed a fracture of the skull extending from the orbit of the left eye way back to the head. He stated that X-rays were taken and that these were identified and offered in evidence later; that Emma Pujals lost the sight of her left eye and that, besides, she stutters at present because the area of the brain which controls speech was affected; and that the wounds were serious. He admitted that the wound of the occipital region would have caused her the loss of consciousness, as well as any other one of the wounds which she received on her head.

"The alleged victim in this case, Emma Pujals Quiñones, testified that she lives in Floral Park, Hato Rey, and that she had been working on January 1, 1955 as secretary in the Federal Collector's Office, for more than four years. That on the night of January 1, 1955 she was visiting a friend in Río Piedras, and that she was riding home from Río Piedras on a Transportation Authority bus, on her way to fetch her small niece and her mother who were at home waiting for her, in order to spend January 1, the evening of New Year's Day, with her brothers and sisters; that she stepped off the bus at the Ruiz Belvis stop; that she was alone, she alighted from the bus alone, and she continued to walk alone towards her house with the above-mentioned purpose; that she walked along the side culvert of the sidewalk on the right-hand side, coming from the stop, towards her home, and as she walked, she heard someone's steps behind her; but that she did not look back, and that when she reached the front of the Espíritu Santo Church, she felt a blow on her left shoulder which frightened her; that she raised and moved her right hand, frightened, and then she looked back and she saw a man; that she looked at that man and did not know why he had hit her; that then she felt the other blows on her head which left her unconscious until he struck the fatal blow which made her fall; that she cannot say anything more after she fell unconscious; that the man who struck her is present in this Court, and she pointed at defendant as the one who struck those blows. She said that he was wearing dark navy blue pants and a white shirt; that she was aware of the first blow; that when she looked at defendant after the first blow, she saw him with the club in his hands, a club about three feet long, more or less. She recognized the club as a club like this; and

she stated, besides, that there was plenty of light in the place; that she had never seen defendant before, nor did she know him; that she was struck the second blow two or three minutes after the first blow, but that it happened swiftly, that it could have been seconds after the first blow and after she looked; that she was walking without her glasses that day; that she kept them in her handbag because she has a defect of vision, that she sees more than she should; that she has no difficulty in seeing near-by objects, but she cannot see well from a distance. That she had no argument whatever or words with the man; that it is not true that defendant asked her for the time or that she told him, "I do not speak to strangers." That she felt the first blow strongly, and that then defendant snatched her handbag and then came the other blows; that it was defendant who snatched her handbag, the same one who struck her, and that there was only one person present besides herself; that she may have moaned, but that she did not speak.

"Manuel González Seijo testified that on January 1, 1955 he lived at the corner of Caribe and Matienzo Streets; that he was at his niece's house that January 1, until about eleven o'clock at night; he testified that someone called his attention to the fact that a man was tearing the antenna from his car, which was parked in front; that he went over and the man was pointed out to him and he climbed in his car and followed the man, stopping at Duarte Street, where he asked him what he was doing, and the man answered that he was doing nothing; that the man walked with a crossbar shaped like a yoke with his hands placed in this manner; that he took the piece of wood and threw it in the side culvert and told him, 'Don't walk with that crossbar because the police is going to get you'; that then he went to get into his car in order to leave, and then the man said, 'No, I am going to take the crossbar again to defend myself from all those drunkards who are walking around' and he took the crossbar from where he had thrown it; that he went home, and when he arrived he found a police jeep lighting the place in front of the Espíritu Santo Church and he asked what was going on, and when he was told, he informed the police about the incident which had taken place with the man with the club, and that the next day at about two o'clock in the morning a Police Sergeant and the owner of the Chicken Inn brought an individual to him for identification. That he did not identify

him and said that that was not him, and that later the club was taken to him and that he identified it; that the man who was carrying the club and whom he met that night was the defendant in this case; that he was wearing dark pants and a white shirt as the one he is wearing in Court; that he has no doubt as to the fact that defendant is the man whom he saw; that he saw him again when he was taken to him by the Police captain for identification about four or five days after the events. That he identified him immediately and again identified the club or piece of wood which was admitted in evidence; the witness states that he has no doubt that that was the same club. He said that he saw defendant at the place where there is a lamp post; that he spoke to him for scarcely five minutes; that it is not true that he told policeman José Díaz Hernández, in the presence of Ramírez Brau, that he could not identify the man with the club on Saturday, January 2, at nine-thirty in the evening; that he does not know policeman José Díaz Hernández; that defendant identified himself that night, he took out his wallet or tried to take it out and gave him his name, but that he did not remember his name, and thereafter recalled that it was Alejandro Dumas; that defendant did not open his wallet: but that he told him that he lived at 114 José Martí Street.

"Francisco A. Orono testified thereafter, and said that he was a sergeant at the Police in Hato Rey; that he was a sergeant on January 1, 1955, that when he was notified of the facts of this case, he sent two policemen to the scene of the crime and later he went to the place itself and started to investigate the neighbors, one called Cestero and the other called Calzada, who live in front and next to the scene of the crime; that he seized the piece of wood, which he identified as the club presented in evidence by the prosecuting attorney in this case, which was hidden close to a trunk of a tree and among some hibiscus plants in an adjacent lot, and which was stained with blood. He could not determine the type of blood, whether animal or human; but that it was blood; he smelled it.

"Rafael Santiago Carmona testified that he was a chemist for the Police, and the Defense accepted his capacity as such. He said that he received the piece of wood which he identified; that it had blood stains which extended sixteen inches from one end to the other; that he examined the blood stains and found

that it was human blood, having determined by a chemical method which he explained, that it was type A blood; that a test tube was sent to him containing blood which was supposed to belong to Emma Pujals Quiñones, and the witness also decided that the blood type of this other blood was also type A, and that they were homologous or identical. He also stated that he examined certain pieces of evidence, such as a woman's girdle also stained with type A human blood; some tree leaves and branches, which he also found were stained with type A human blood; a cancanpetticoat in the same condition, that is, stained with type A human blood; stockings and shoes, which were not blood-stained; a bedspread, also in the same condition, and a black strapless woman's dress, in the same condition. The prosecuting attorney offered and the court admitted in evidence, the X-ray photographs and the piece of wood to which we have referred, and which were identified by the witnesses."

## V

Among the instructions given to the jury, there are those relative to: (a) the duty of the jury to render a verdict solely on the evidence offered; (b) the duty of the prosecuting attorney to prove defendant's guilt with all the elements required by law—which were pointed out thereafter—and beyond a reasonable doubt; (c) the existence of the presumption of innocence; (d) the right of defendant to abstain from testifying; (e) the duty of the jury to find defendant not guilty if they believe: that no crime whatsoever had been committed or if committed, that defendant was not the author thereof or if they had a well-grounded and reasonable doubt as to his guilt.—t. 93–99.

When the judge finished his instructions he asked the prosecuting attorney and counsel for the defense whether they wished to request any special instructions. Both parties answered negatively.—t. 100.

## VI

On June 17 the jury rendered a unanimous verdict of guilty for the crime charged. Said verdict was accepted by the court and defendant was convicted.

Counsel for the defense requested and was granted a ten day continuance for the pronouncement of sentence.—t. 101. On June 27 counsel for the defense filed a motion requesting the annulment of the trial and the verdict and the granting of a new trial, previously transcribed. The following July 12 was set for hearing said motion. At the commencement of the hearing on that day its continuance was requested by counsel for the defense for the purpose of summoning as witnesses the editor of "El Mundo," Enrique Ramírez Brau, and the editor of "El Imparcial," Frank Rodríguez. The court granted the continuance, set the hearing once more for August 8, and ordered the summoning of both witnesses.

The hearing of the motion was held on August 8. Counsel for the defense limited himself to offering three newspaper clippings as evidence to support his motion, two from "El Mundo" and one from "El Imparcial." They were admitted without the objection of the prosecuting attorney. Counsel for the defense did not offer any other kind of evidence. The prosecuting attorney, on his part, did not present any evidence whatsoever. The motion was submitted on the sole presentation of these three newspaper clippings, the contents of which were included in the motion. On October 14, 1955 the judge rendered a decision denying the motion in all its parts in the terms which we have already transcribed.

The foregoing allegations—extensive by necessity—on the facts and concurring circumstances at each stage and moment of the criminal prosecution wherein appellant Alejandro Dumas Márquez was tried, could be considered as the most precise and sufficient ground for concluding that at no time in the course of each step and moment of the prosecution defendant's rights were actually violated, and that, on the contrary, he fully enjoyed a fair and impartial trial. However, we believe it is necessary to review the different questions raised

in the brief filed by the distinguished attorneys for the defense.[1]

We may agree in substance with the defense as to the following averments made by counsel: (1) that during the first days of January, 1955, the daily newspapers of Puerto Rico published the facts with which appellant was charged; (2) that the district attorney and Police officers contributed in making these facts public; (3) that an alleged confession of defendant was the object of this publicity; (4) that the prosecuting attorney did not present defendant's alleged confession in evidence; (5) that "the only testimony which 'directly' connected appellant with the commission of the offense was that of the victim"; (6) that the decisions of the Supreme Court of the United States have held that the consequences of "a trial by newspaper" may be assuaged in various ways, for example, by requesting a change of venue, and by requesting a continuance of the trial for some time; (7) that said decisions have also condemned prosecuting attorneys when they become instruments for the press to judge defendants in the forum of public opinion without the due guarantees, and (8) that in the case of *Shepherd* v. *Florida*, 341 U. S. 50, Mr. Justice Jackson and Mr. Justice Frankfurter were of the opinion that considering the attendant circumstances in this case, prosecuting attorney's press release stating that defendant had confessed was prejudicial to the rights of defendant when this confession was not offered at the trial.

---

[1] The People has not raised the impropriety of that motion for a new trial on the ground of the improper conduct of the prosecuting attorney. In various cases, interpreting § 303 of the Code of Criminal Procedure, we have decided that certain improper conduct of prosecuting attorneys— it is alleged herein that he permitted the publication of the alleged confession without having presented the same in evidence—does not constitute legal grounds on which the lower court may grant a new trial. *People* v. *Serbiá*, 78 P.R.R. 750, 753 (1956); *People* v. *Reyes*, 76 P.R.R. 277, 279, 281 (1954); *People* v. *Fraticelli*, 70 P.R.R. 288, 290 (1949); *People* v. *Vega*, 69 P.R.R. 376, 379 (1948).

Up to this point our possible concurrence with appellant. The statements which we reject because they fail to agree with the facts proved, or with the applicable law, or with the jurisprudential doctrine established on the matter, or with the dictates of a sound criticism, are as follows: (a) that the Prosecuting Attorney, in this specific case, "used the country's press as an instrument to make the facts public"; (b) that the testimony of the victim was not sufficiently convincing to connect defendant with the commission of the crime with which he was charged; (c) that all the jurors stated "that they had read in the papers the reports of the crime, that is, the information transcribed in the motion"; (d) that it was the duty of the prosecuting attorney to bring to court and offer the confession made by defendant; (e) the publication of the confession made an impression in the mind of the jury who tried the case; (f) that neither the removal of the trial to another district nor the continuance of the trial were sufficient to mitigate the consequences of the publication of the trial in the newspapers; (g) that in this case, the conduct of the prosecuting attorney in failing to present defendant's confession impaired the right of appellant to a fair and impartial trial; (h) that in order for the prosecuting attorney to be able to offer defendant's alleged confession to contradict him, said prosecuting attorney was not bound to prove its voluntariness beforehand. Let us see.

 (a) Counsel for the defense did not prove in any manner whatsoever during the trial, or at the hearing of the motion for a new trial, that the prosecuting attorney used the country's press as an instrument to make the facts public, or that he started an "out-of-court" campaign to obtain the conviction of the defendant. Although he summoned the editors of "El Mundo" and "El Imparcial" in order to testify at the hearing of the motion, he did not use them to prove that point. It is true that the newspaper "El Imparcial" published two photographs with the information on Friday,

January 7, 1955, wherein the prosecuting attorney appears with the defendant at the bottom of one of the pictures it says: "Under the examination of the prosecuting attorney... who is showing him the club used in assaulting Emma Pujals, ex-jockey Alejandro Dumas Márquez confesses his crime at the Detective Headquarters in San Juan," and in the other: "Alejandro Dumas (right) signs his confession before the prosecuting attorney." But this, by itself, does not show in effect that "the prosecuting attorney used the press as an instrument" for making the facts public. What may be inferred, at the most, from the photographs and the text of the same—in absence of a public reputation on the part of the prosecuting attorney of these reports—is that the prosecuting attorney allowed that they be taken and published with their corresponding texts. Who invited the press to take these photographs? The record does not say. Did the prosecuting attorney dictate or suggest their texts? The record again does not say.

In the newspaper reports about the details of the crime and the alleged confession—except for its possible motive—there was no information of the details of the crime or of that confession, attributed to the prosecuting attorney, and much less his opinion or belief as to the guilt of defendant. It was the reporters themselves, Ramírez Brau and Rodríguez, who published their version of the facts, in the same terms as defendant narrated or confessed them, and as a result, according to them, of their own investigations or inquiries. It is true that from these reports it appears that the prosecuting attorney, in some way which does not clearly arise from the publications, contributed with his tolerance that the reporters of these newspapers be wholly informed of defendant's alleged confession.

Even if the prosecuting attorney did not use the press as an instrument to make the details of the crime public, with the calculated purpose to impair the constitutional guarantees

protecting the defendant, his conduct in permitting the press photographers to take his picture with the defendant at the time when the latter was testifying before him as to the facts, and at the moment when he was signing an alleged confession, was not only inappropriate, but unlawful. The conclusion we reach in the sense that that conduct, in this particular case, was off-set by other circumstances, does not make it less inappropriate or less unlawful.

Section 3 of the Code of Criminal Procedure provides that the prosecuting attorney shall file his information "in open court," not publicly, through the press or by any other public means; § 11 of the same Code provides that the examination of witnesses by the prosecuting attorney "must be in private," not before the public, reporters or press photographers or strangers to the investigation which is being performed.

The prosecuting attorney cannot become a publicity agent. His duty to inform and investigate does not authorize him to promote, allege or encourage the publication of extrajudicial statements, testimonies or confessions which he gathers in the course of his investigation of the facts. He shall not become a conscious participant in the so-called "trials by newspaper." This may likewise apply to the counsel in criminal cases, for the abstinence policy operates both ways.[2]

---

[2] Among the specified recommendations prescribed in the "Report of the Governor's Committee for the Study of Civil Rights in Puerto Rico," published in August 1959, by the Bar Association of Puerto Rico Editorial, at p. 186, the following appears:

"6. The legal provisions which define as crimes the actions of public officers who violate rights and due process should be rigorously applied.

. . . . . . .

"10. The problem of undue publicity of the investigations performed by the prosecuting attorneys and other public officers, as well as of cases pending before the courts, has reached a truly critical stage. This critical situation is emphasized since defendant's attorneys have incurred as frequently if not more, in such an undesirable practice.

"The prosecuting attorneys, police officials and counsel for the defense should restrain from resorting to the press in order to create a favorable or unfavorable environment, as the case may be, for the persons accused or under investigation.

In *People* v. *Fournier*, 77 P.R.R. 208, 280 (1954), we stated the following regarding press releases prior to trial:

"There are no easy solutions in the task of protecting both the freedom of the press and the right of a defendant to a fair and impartial trial. The two interests which must somehow be balanced have been described by Mr. Justice Frankfurter in his opinion in *Maryland* v. *Baltimore Radio Show Inc. et al., supra,* as follows at p. 920: 'One of the demands of a democratic society is that the public should know what goes on in courts by being told by the press what happens there, to the end that the public may judge whether our system of criminal justice is fair and right. On the other hand our society has set apart court and jury as the tribunal for determining guilt or innocence *on the basis of evidence adduced in court,* so far as it is humanly possible.' (Italics ours.) This problem was recently explored in a thoughtful article by Jerome H. Spingarn entitled 'Newspapers and the Pursuit of Justice' appearing in *The Saturday*

---

"The defendants have a right to a fair and impartial trial. The officials should not furnish information to the public which might jeopardize this right. On the other hand, the attorneys for defendants should not, under the guise of protecting the rights of their clients, incur in the practice which we condemn in the case of public officers. Both parties should defend their corresponding rights before the courts and not before public opinion."

Our Honorable Secretary of Justice, Hiram R. Cancio, concerned with the seriousness of this problem, issued a circular letter in January 1960, addressed to all the prosecuting attorneys and assistant prosecuting attorneys of Puerto Rico, on the undue publicity given to the investigations of the prosecuting attorneys, which insofar as pertinent reads:

"I have noticed that on certain occasions there has been an extraordinary display of publicity in relation to certain investigations performed by prosecuting attorneys in criminal cases.—I beseech each and every one of you to cooperate in the sense that your press releases be limited to those facts which are strictly necessary in order to let the event which is being investigated be known, although by this I do not mean that prosecuting attorneys should impair in any manner whatsoever press diligence to obtain information.—*It is highly undesirable that the names or other information related to informers be made public.* I know that not one of you would, consciously, reveal facts of this nature. But I ask you to take precautions to prevent that third parties may become informed and make these facts public. This may unnecessarily prejudice persons who have cooperated with the authorities in the investigation of an event.—Undue publicity of the investigations performed by the Prosecuting Attorneys may in certain cases affect the objectiveness with which public opinion focuses the facts

*Review*, April 3, 1954, p. 9. After giving illustrations of the sensational and incriminating accounts of a pending case in the city of New York, Spingarn goes on to point out that 'It will not be easy . . . to find jurors whose impartiality has not been violated. There are very few people in the city who have not read about the 'confession,' who do not know or think they know, every detail of the criminal act, who have not speculated on motives. And are there any who have not formed their opinions as to guilt, and have not even gone on to measure the mercy with which they might temper justice? . . . There is certainly nothing wrong about the publication of the news story itself. . . . But such reading before trial and conviction might be a luxury we can ill afford if we are at the same time to maintain our Constitutional guarantee that accused persons are to be presumed innocent until proven guilty and are to be tried before an impartial jury.' "

■ (b) Was the victim's testimony convincing as to connect defendant with the commission of the crime? Undoub-

---

thereof, which would unquestionably create prejudices against a sound administration of penal justice.—I think it is appropriate to refer to the dictum of the Honorable Supreme Court of Puerto Rico in the case of *People* v. *Fournier*, 77 P.R.R. 208, 283–4:

'. . . Cases should be tried in the courts, not in the newspapers prior to trial. It follows that attorneys for defendants as well as prosecutors normally should forbear from releasing for publication evidence which they hope to present in court . . . .

'The whole problem of what has been called "trial by newspaper," is an acute one under modern conditions of mass communications. . . . . Only by mutual cooperation and understanding between attorneys and the press can both fundamental principles—the freedom of the press and the right of a defendant to a fair and impartial trial—be effectively preserved.'

"I wish to point out, besides, that one of the recommendations in the report of the Governor's Committee for the study of the civil rights in Puerto Rico raises this question:

'Prosecuting Attorneys, police officers, and the attorneys for defendant should forbear from resorting to the press in order to create a favorable or unfavorable environment, as the case may be, for the persons being investigated.'

"I urge you to adhere firmly to the foregoing, since I think that, undoubtedly, these principles constitute the best standards which can be followed in relation to the publicity of the investigations in criminal cases.

"I order that hereafter, you keep with extraordinary zeal the investigations which you perform, within the soundest discretion . . . ."

See Canon 20 of the Canons of Professional Ethics, 48 P.R.R. XVII.

tedly, it was. Her testimony, insofar as pertinent, is as follows:

(Direct examination) :

"Q. "What did you do when you felt that hard thing strike you on your left shoulder?

A. It frigthened me, and I moved my hand thus, and looked.

Q. What did you see when you looked?

A. I saw the man who struck me, with a club.

Q. What kind of a club was it?

A. It was a thick, broad club, like this and this. Then I did this and looked and saw him.

Q. How was that man?

A. I saw that man and I looked at him. I was just scared, because I did not know why he was striking me, and then I looked back and then came the other blows.—t. 44.

. . . . . . . .

Q. Please tell the ladies and gentlemen of the jury who that man was who struck that first blow on your shoulder, followed by a series of blows which left you unconscious.

A. *The man at whom I looked and saw, the man who struck me here, is that man who is present.*

Q. Who is that man? Please, point him out.

A. *That man.*

Prosecuting Attorney: *Pointing at defendant.*

Q. *This man here?*

A. *Yes, sir.*

Q. Was that the man who struck you that night?

A. Yes, sir, he was the one who struck me.

Q. Please tell the court how this man whom you have accused of having struck you was dressed.

A. The man who struck me the first time, the one I saw . . . that man was wearing a dark suit, like dark navy blue pants and a white shirt. And the club in his hands.—t. 45–46.

. . . . . . . .

Q. *And the man who struck you, Emma, who is he?*

A. *That man who is there, Dumas Márquez.*

Q. *Is he here?*

A. *Yes, sir.*

Q. *Where is he seated?*

A. *That man there.*

Q. *The defendant?*

A. *Yes, sir.*—t. 47.

. . . . . . . .

Cross-examination:

Counsel for defendant: Q. Had you seen Dumas before that date?

A. I had never seen him. I had never met him personally, no.

Q. You mean that the first time that you saw him was the night of the crime?

A. Yes, sir.

Q. How long was it from the time you were struck the first blow and the second?

A. It could have been two or three minutes between the first and second blows.

Q. Then you received one blow and then another?

A. It happened quickly because when I looked there came blow after blow after blow.

Q. Then was it a question of minutes or seconds?

A. I mean seconds.

Q. And in that lapse of time you were able to notice the clothes which defendant was wearing or the person who struck you, and you could also see who the person was?

A. I saw him when he struck me the first time; I saw him as he appeared: that he had the club, that he was wearing a white shirt and dark or navy blue pants.

Q. You mean that in a matter of a fraction of seconds you had the opportunity to examine the clothes which that person was wearing, and you could notice that he was carrying a club— in a place which was quite dark?

A. When I was there, in front of the Church, it is not so dark there; precisely because the place now is not as it was some years ago.

Q. But it is not a very lighted place; it is not as clear as daylight. ... ?

A. No, sir, it is not as clear as daylight; but it is different, because when one looks one can see.

Q. And you say that a person whom you have never seen before, that you see for the first time, under those circumstances, receiving a blow, in a matter of fractions of seconds, you say that you could see the person who struck you?

A. *Well, yes, I saw him. It was the only time I looked at him, and I saw him."*

Some essential parts of the victim's testimony were corroborated by the testimony of witness Manuel González Seijo; which in part, is as follows:

Q. And who was the individual of the incident of the club, in Duarte Street, with whom you were and whom you asked what he was doing around there?

A. This young man who is here.

Prosecuting Attorney: Pointing at Alejandro Dumas Márquez.

Q. What was he wearing that night, do you remember?

A. He was wearing a pair of pants like the one he has on now, more or less.

Q. What color was it?

A. Blue.

Q. And what else?

A. And a white shirt also, like the one he is wearing now.

Q. Was he wearing a coat?

A. No, sir.

Q. Was he wearing a hat?

A. No, sir.

Q. *Are you positively certain that this was the man who was walking with the club that night?*

A. *Absolutely.*

Q. *Have you no doubts about it?*

A. *Absolutely none, sir.*

■ (c) Did all the jurors state that they had read in the newspapers the information about the crime, that is, the information transcribed in the motion? None of the members of the jury categorically stated that he had read in the newspapers all the information related to the crime. From the summary of the *voir dire* which we have previously made it appears:

Jurors M.O., M.I., J.A., L.M. and A.R.D. were summoned with the first group of the jurors examined. When counsel for the defense asked: "Which persons in the jury have become acquainted with these facts through the press?"—t. 2—

not one of these first five persons showed to have knowledge thereof. Jurors E.A. and J.G.G., summoned thereafter to complete the jury, were not questioned at all, and much less regarding press reports.

The remaining five jurors, J.M.R., A.R., J.R.M., G.N.A. and A.V., were the only ones questioned on press reports and who stated, in the terms which were set forth in the summary, that they had read "something" in the newspapers, either "the headlines" or "the captions," but that they did not remember that they did not know either the defendant or the victim; that they had not formed any opinion on the case and that they would render a verdict on the evidence offered by the parties. A.V. was the only one who said to have seen a photograph in the newspapers, but that he did not recall the same.—t. 21.

Therefore, the statement made by the trial judge in the second paragraph of his Decision denying the new trial in the sense that *all* the jurors were "amply" asked whether they had read the newspapers or not in relation to the reports made on the case, is not entirely correct.

■■ (d) Was the prosecuting attorney bound to bring to trial and offer the confession made by defendant?

The record does not contain the text or contents of defendant's alleged confession. We have an idea of its existence and contents from the photographs and reports published by the press. Defendant never asked for a copy of the same or asked that it be shown to him or that he be allowed to examine it. We have not been placed in a position to determine whether it is actually a confession or a question of incriminating or exculpatory statements, or a combination of both.

Defense counsel was the only party who mentioned said confession and during the impanelling of the jury, when, in the *voir dire* of juror A.V., he asked: "Did you read any-

thing in relation to an *alleged confession of this defendant?*"
The juror answered in the negative.—t. 19.[3]

We have not been able to find any statutory or constitutional provision or jurisprudential doctrine, which under identical or similar circumstances to those of the case at bar forces the prosecuting attorney to offer and present said confession at the trial. On this point the trial court stated:

"The Prosecuting Attorney offered oral testimony of eye witnesses, such as the victim herself, and other witnesses who saw defendant near the scene of the crime and who testified besides as to certain details and circumstances. The Prosecuting Attorney did not present defendant's confession in evidence. If he had it he deemed it wise not to offer the same. Perhaps, in order to avoid arguing any question which defendant might raise regarding the publicity which said confession had received in the press. Defendant did not present any theory or evidence of any kind whatsoever."

The appellant extensively quotes in his brief the rulings in the decisions of *Shepherd* v. *Florida,* 341 U.S. 50 (1951) and *Stroble* v. *California,* 343 U.S. 181 (1952). The principles held in both cases have emerged in the course of the bitter and historical struggle between the American press and the judiciary, on the unrestricted releases on pending litigation, wherein the former invokes the constitutional right of freedom of expresion and the latter invokes the constitutional rights of a defendant to a fair and impartial court trial. The

---

[3] That question made us remember a portion of the statement of the case made by the trial court, which was copied in the dissenting opinion in the case of *Maryland* v. *Baltimore Radio Show,* 338 U.S. 912, 916 (1950), which is as follows:

"The suggestion was made here also, that the mischief could have been avoided by exercising the right of the Defense to examine, on their voir dire, all prospective jurors and then inquiring as to whether or not they had heard these broadcasts. Well, now, it hardly seems necessary for the Court to say to men who are experienced in the trial of jury cases, that every time Defense Counsel asked a prospective juror whether he had heard a radio broadcast to the effect that his client has confessed to this crime or that he has been guilty of similar crimes, he would by that act be driving just one more nail into James' coffin."

Federal Supreme Court has recognized the right of the press to comment pending litigations, but this is not an absolute right capable of being exercised in every conceivable way and manner. It has also recognized the right of the Federal Government and of the state government to impose restrictions on that freedom of expression, but not as an absolute right which authorizes all sorts of restrictions. It has also recognized that an accused may be deprived of his right to a fair and impartial trial because of adverse publicity of his case in the newspapers which really and seriously prejudiced the community against him.[4]

The different opinions expressed, the different solutions, formulas or tests offered, the different judicial attitudes adopted towards the problem do not seem to have been appropriate up to the present time to fix a definite, permanent and universally accepted boundary line in the conflict between those fundamental rights.[5]

But we very much doubt that there exists any precedent sustaining that the mere publicity of a confession made more than five months prior to trial, allowed or encouraged by a prosecuting attorney, who did not offer it in evidence, constitutes in itself a legal ground for invalidating an entire criminal action and making fatally imperative the granting of a new trial. This is precisely the situation in this appeal

---

[4] *Times Films Corp.* v. *Chicago*, 365 U.S. 43 (1961) especially in the dissenting opinions of Chief Justice Warren, pp. 50–78, and of Mr. Justice Douglas, 78–84; *Maryland* v. *Baltimore Radio Show Inc.*, 338 U.S. 912 (1950) opinion of Mr. Justice Frankfurter; *Adamson* v. *California*, 332 U.S. 46 (1947); *Craig* v. *Harney*, 331 U.S. 367 (1947); *Pennekamp* v. *Florida*, 328 U.S. 331 (1946); *Bridges* v. *California*, 314 U.S. 252 (1941); *Gitlow* v. *New York*, 268 U.S. 652 (1925); *Moore* v. *Dempsey*, 261 U.S. 86 (1923); *Toledo Newspaper Co.* v. *United States*, 247 U.S. 402 (1918). *Contempt by Publication*, 59 Yale Law Journal 534.

[5] "Contempt by Publication," *supra*, footnotes 5–9, pp. 536, 537; "Inflamatory Pre-Trial Release by the Prosecutor and the Due Process Clause," 47 N.W.U.L.R. 728; "Controlling Press and Radio Influence of Trials," 63 Harv. L. R. 840; "When the Press Collides with Justice," 34 J. Am. Jud. Society 46; *Ex Parte Craig*, 282 Fed. 138.

in which defendant voluntarily submitted himself to a trial by jury, and after a verdict of conviction he alleged, for the first time, that his right to a fair and impartial trial was violated because of the adverse publicity which was given six months before to his alleged confession and was not offered at the trial, confining himself at the hearing of the motion to merely offering in evidence the afore-mentioned newspaper clippings.

In the majority opinion in the case of *Stroble* v. *California, supra* at 198, it was stated:

"As was said in *Adams* v. *United States ex rel McCann,* 317 U.S. 269, 281 (1942) :

'If the result of the adjudicatory process is not to be set at naught, it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside, and that it be sustained not as a matter of speculation but as a demonstrable reality.' "

It is true that the concurring opinion in *Shepherd* v. *Florida, supra,* considered as improper and prejudicial the prosecuting attorney's conduct in not offering in evidence defendants' alleged confession released to the press and which they had given, according to the information attributed to the sheriff who was charged with their custody. However, said conduct was not the only factor which was taken into consideration when reaching the conclusion in said concurring opinion that the defendants were never tried by due process of law. The evidence showed the following set of facts and circumstances:

On the 16th of July, 1949, a seventeen-year-old white girl reported to the police that she had been raped, at the point of a pistol, by four Negroes, in Lake County, Florida. Six days later those four men were indicted. On the following September 1, three of them were tried—a month and a half after the alleged rape—; one of them was killed resisting

arrest. Two out of the four defendants were convicted, without recommendation of mercy, and sentenced to death. The other, a minor, escaped the last penalty by a recommendation of mercy for him.

While they were being held in custody by the sheriff the latter informed the press that the three defendants had confessed the commission of the crime. The press published the confession released. Then a furious and tumultuous mob gathered around the jail where they were and demanded that defendants be turned over to it. By order of the court, they were transferred to the state prison, where they remained until about two weeks before the trial. Meanwhile, a mob burned the home of defendant Shepherd's parents and two other Negro homes. Negroes were removed from the community to prevent their being lynched. The National Guard was called out for emergency service for three days, and an artillery regiment was summoned from Tampa. Many Negroes of the community abandoned their homes and fled. Every detail of these events was reported by the press under such headlines as "NIGHT RIDERS BURN LAKE NEGRO HOMES" and "FLAMES FROM NEGRO HOMES LIGHT NIGHT SKY IN LAKE COUNTY." Highly prejudicial articles were published by the press, including a cartoon published at the time of the grand jury, picturing four electric chairs and headed: "NO COMPROMISE—SUPREME PENALTY."

Counsel for defendants made two motions, one for continuance of trial until the passion had died out and the other for a change of venue. Both were denied.

The Supreme Court of Florida, in affirming the conviction observed that "The inflamed public sentiment was against the crime with which the appellants were charged rather than defendant's race."

The trial judge was evidently concerned about violence at the trial. The promulgated special rules which limited the number of visitors, allowed no one to stand in hallways and

stairways; he ordered that the elevators be closed to the public except to persons with a special permit; he required each person entering the court room to submit to search; he prohibited any person from taking a "valise, satchel, bag, basket, bottle, jar, jug, bucket, package, bundle, or other such item" to the courtroom; he allowed crutches, canes and walking sticks only after inspection by the sheriff showed them to be necessary aids; he prohibited public demonstrations. The sheriff was charged to enforce those regulations and to that end he was authorized to employ such number of deputies as might be necessary.

At the trial the witnesses and persons called as jurors said they had read or heard the reports published by the press. An editor of one of the newspapers, explaining the source of a statement in an article in his paper about defendants' confession, said that the information was based on articles in the various daily papers, and personal conversations he had with "people generally."

In the concurring opinion of Mr. Justice Jackson, with which Mr. Justice Frankfurter agreed, it is stated that the precautions of the trial judge show the reaction that the atmosphere which permeated the trial created in his mind; that said judge felt helpless to give the accused any real protection against the out-of-court campaign to convict; that these convictions did not meet any civilized conception of due process of law; that the trial took place under conditions which would deny defendants a fair trial before any kind of jury and that the case presents "one of the best examples of one of the worst menaces to American justice."—P. 55.

Mr. Justice Jackson stated that the only rational explanations for the nonproduction in court of the confession were: that the story was false or that the confession was obtained under circumstances which made it inadmissible or its use inexpedient.—P. 51.

In the case of *Stroble* v. *California, supra,* the facts may be summarized as follows: Early in the morning of November 15, 1949 the body of a six year old girl was found behind an incinerator in the back yard of the home of Stroble's daughter in Los Angeles. It was wrapped in a blanket and covered with boxes. A necktie was wound twice around the child's neck. An axe, knife and hammer were found in the vicinity of the body. An autopsy revealed that the immediate cause of death was asphyxia due to strangulation, that she had been sexually attacked and that she had six skull fractures, a deep laceration in the back of the neck, and three puncture wounds in the chest.

Some six months before, Stroble had jumped bail on a charge of molesting a small girl and had never since been apprehended. Suspicion immediately focused on petitioner, who had been visiting his daughter the day before the strangled child's body appeared, that is, November 14. In the morning of November 17, as Stroble entered a restaurant in downtown Los Angeles, a civilian recognized him as the man whom the police were seeking in connection with the child's murder and he reported to the police that Stroble was there. A police officer, Carlson, came and arrested him. He was driven in a police car to the District Attorney's office. While in route Stroble told the police that he had killed the little girl. Stroble testified before an assistant district attorney and in the presence of some nineteen persons confessing commission of the crime and stating details of the same.

Defendant was charged with first degree murder. He pleaded not guilty and not guilty by reason of insanity. Thereafter, in the six weeks' period between the date of his arraignment and the beginning of his trial, defendant was examined by four psychiatrists and one clinical psychologist. To each of these persons he stated that he had killed his victim and recounted, in detail, how he had gone about the killing.

Before the trial, the District Attorney released to the press the details of the defendant's confession in his office and announced his belief that Stroble was guilty of the horrible crime with which he was charged, and that he was sane at the time of the crime and still was.

Extensive excerpts from the District Attorney's releases and all the sordid details of the crime were published by the press, radio and television. As a result of this publicity there was public hysteria or widespread community prejudice against defendant. The headlines of the "Los Angeles Herald Express" of November 18, 1949—three days before the preliminary hearing and 47 days before the trial started—read: "Lynch him! Howls Crowd as Stroble Goes to Court." The average daily circulation of the newspapers commenting on the case was 1,200,000 copies.

The search for and apprehension of defendant was attended by much newspaper publicity. They featured the "manhunt" which the police were conducting. Large headlines described Stroble as a "werewolf," "a fiend," "a sex-mad killer" and the like. The spate of newspaper publicity of the case abated during the subsequent days. The Governor of the State called a special session of the legislature to consider, among other things, the problem of "sex crimes," a committee of the state legislature investigating "sex crimes" held hearings in Los Angeles, at which the District Attorney stated that he did not see why sex offenders shouldn't be disposed of the same way as mad dogs. The newspapers in that city published accounts of each of these events, and the accounts made reference to the murder with which Stroble was charged. The trial, which started on January 3, 1950 and ended on the 19th of that same month, was published by the newspapers, which occasionally referred to the defendant as a "werewolf." The press took photographs of scenes of the trial which were thereafter televised. The evidence presented at the trial consisted for the most part, of Stroble's statements

to the police as he was being driven to the District Attorney's office, his confession at the District Attorney's office and his statements to the five doctors who examined him before the trial. None of these confessions were challenged by the defense on the ground that were involuntary. Stroble was convicted and sentenced to death. The Supreme Court of California affirmed the conviction. Petitioner requested its reversal before the Supreme Court of the United States alleging that there had been a violation of his right to a due process of law, grounded on five reasons, and among them,. that the newspaper accounts of his arrest and confession inspired by the District Attorney, were so inflammatory as to make a fair and impartial trial impossible.

Mr. Justice Clark delivered the majority opinion of the court which affirmed the judgment of the Supreme Court of California. Dissenting opinions were delivered separately by Mr. Justice Frankfurter and Mr. Justice Douglas.

In this majority opinion it is concluded that all of Stroble's confessions were voluntary and their admision in evidence was correct. The action of the District Attorney in releasing to the press certain details of the confession was depreciated, but it was found that the transcript of that confession which was read into the record at the preliminary hearing four days later, would have become available to the press at that time, "for what transpires in the court room is public property"—p. 193—and that, on the other hand, petitioner had not shown how the publication of a portion of that confession four days earlier prejudiced the jury in arriving at their verdict two months thereafter. The majority also decided that petitioner had also failed to show that the newspaper accounts aroused against him such prejudice in the community as to necessarily prevent a fair and impartial trial. It was noted that at no point did defendant's attorneys, who defended him with extraordinary zeal, moved for a change of venue

to another county because it was impossible for petitioner to obtain a fair and impartial trial due to adverse publicity.

Its final paragraph on this point is as follows:

"The matter of prejudicial newspaper accounts was first brought to the trial court's attention after petitioner's conviction, as one of the grounds in support of a motion for a new trial. At that time petitioner's present attorney urged that petitioner had been 'deprived of the presumption of innocence by the premature release by the District Attorney's office of the details of the confession,' and offered in support of that allegation certain Los Angeles newspapers published at the time of petitioner's arrest. The trial court replied as follows:

'The jurors were all thoroughly examined and all definitely stated that they would give to the defendant the benefit of the presumption of innocence. . . . There is nothing to show those jurors ever saw those papers or ever read those papers. They were fully examined so far as defense counsel desired as to any knowledge or information they might have of the case.'

"Petitioner does not challenge this statement of the court. Indeed, at no stage of the proceedings has petitioner offered so much as an affidavit to prove that any juror was in fact prejudiced by the newspaper stories. He asks this Court simply to read those stories and then to declare, over the contrary finding of two state courts, that they necessarily deprived him of due process. That we cannot do, at least where, as here, the inflammatory newspaper accounts appeared approximately six weeks before the beginning of petitioner's trial, and there is no affirmative showing that any community prejudice ever existed or in any way affected the deliberation of the jury. It is also significant that in this case the confession which was one of the most prominent features of the newspaper accounts was made voluntarily and was introduced in evidence at the trial itself."—Pp. 194, 195.

If the prosecuting attorney apart from the alleged confession, had sufficient evidence to prove the commission of the offense and obtain defendant's conviction, we do not see why he was obliged to offer at the trial, besides, the alleged confession which was published.—*Robinson* v. *United States,*

450

128 F.2d 322; *Curtis* v. *Rives*, 123 F.2d 936; *Fielding* v. *United States*, 164 F.2d 1022.—On the other hand, the defense has not alleged that the confession was either false or involuntary. If the confession was false or involuntary, and the prosecuting attorney knew it, he did the right thing in not presenting it in evidence.

█ (*e*) Did the publication of the confession influence the jury which tried the case? It is sufficient to refer to the previous summary of the examination made to the persons summoned to constitute the jury, in order to answer this question negatively. There was not a single juror who said that he recalled the reports published by the press, or whose feelings, opinions or views on the case were influenced or impressed by any adverse publicity.

Counsel for the defense never proved or attempted to prove that the press gave any publicity to defendant's case after the articles it published in January 1955.

█ (*f*) Defendant did not move for a change of venue to another district. He had plenty of time to request it, from March 10, date of the filing of the information, until June 16, 1955, when the trial commenced. On the ground that a fair and impartial trial could not be had or that a jury could not be obtained for the trial, defendant could have obtained the transfer of his case.—Section 171, Code of Crim. Proc.— But defendant tells us that the transfer of a case is not an effective remedy in Puerto Rico against adverse publicity because of the size of the island and because the two main newspapers of the country are read in every judicial district.

In the case of Dumas Márquez, if it was a real trial by newspaper, it was proved that the adverse publicity did not cause any indelible impression in the mind of the jurors of the same district wherein the crime was committed. The jury was impanelled on the morning of the first day of trial. Only 21 persons were summoned in order to impanel the same. This proves that it was not a highly notorious case. Not one

of the jurors knew defendant or the victim. The few who had read "something," "the headlines" or "the caption," almost six months before, did not even remember what they had seen or read in the press. One of the jurors stated that "he was not in the habit of forming judgment as to the statements in the press" and "I do not reach conclusions since the newspaperman who furnishes the information is subject to hearsay, and he may be stating something that is not true."— T. 5–7.

If that was the situation in the district of San Juan on June 16, in the remaining districts, the case was less notorious, or perhaps, none at all. Under these conditions, it would have been very difficult to obtain the transfer of the case to another district, since defendant had to show the real and effective impossibility of having a fair and impartial trial or of obtaining a jury for his trial in San Juan. As we stated in *People* v. *Collazo*, 33 P.R.R. 554, 556 (1924):

"Generally the kind of local prejudice which gives rise to an unfair trial finds its manifestation even up to the time of the trial, or there has been a real public clamor or some violent movement against defendant or some other notorious public demonstration."

The presumption is that no prejudice exists.—*Cf. Maldonado* v. *District Court*, 71 P.R.R. 502, 506 (1950); *People* v. *Collazo, supra* at 557.

Adverse publicity may or may not be considered as ground for the transfer, when the same has stimulated a hostile and biased attitude against defendant or against the State which upholds the charge.—*Cf. People* v. *Mendes*, 35 Cal. 2d 537, 219 P.2d 1 (1950); *People* v. *Yeager*, 194 Cal. 452, 229 Pac. 40 (1924); *People* v. *Sueser*, 132 Cal. 631, 64 Pac. 1095 (1901).

In the *Stroble* case, *supra*, the majority opinion stated that the failure of defendant's attorneys to seek a transfer

of the action to another county was an indication of the lack of community prejudice against petitioner.—P. 194.

Since the right to the transfer is optional, it goes without saying that the constitutional right to a fair and impartial trial in the district wherein the crime is committed is not waived because the transfer was not requested.

One of the remedies recognized and advised against adverse publicity is to postpone the trial until by lapse of time the danger of prejudice and public hysteria against defendant may reasonably be thought to have been substantially removed.—*Cf. Delaney* v. *United States*, 199 F.2d 107, 114, (1952). Dumas Márquez' attorneys did not move for a continuance on that ground. However, on May 23, 1955, they moved for a continuance in order to locate certain witnesses; on June 16 they moved for continuance until the next day in order to confer with the witnesses which the prosecuting attorney had placed at their disposal; on July 12 they requested the postponement of the hearing of the motion for new trial to obtain subpoenas for two witnesses. On May 17 and on June 6 and 14, 1955, they filed motions requesting the court to order the subpoenas of four witnesses who qualified as "essential witnesses for their defense." The foregoing shows that almost six months after the newspaper published the information of the case, there was not even a reasonable apprehension in the mind of defendant's counsel that defendant could not have a fair and impartial trial or that he could not obtain a jury for his case. The continuance, for June 16, was unnecessary, for reasons of prejudice.

 (*g*) Did the prosecuting attorney deprive defendant of his right to a fair trial when he did not offer the alleged confession at the trial?

Counsel for the defense did not offer any evidence whatsoever to prove that defendant was deprived of a fair and impartial trial, whether it was due to the nonproduction of the alleged confession or for any other reason. He argues

that if the prosecuting attorney had offered the confession in evidence, counsel for the defense would have had the opportunity to challenge the voluntariness of the same and thus remove from the mind of the jurors the impression caused by its publication in the newspapers. If it was clearly proved that none of the jurors had a formed opinion regarding the case through press reports or through any other means which prevented them from considering the case solely on the basis of the evidence offered at the trial, then the defendant had no need of a confession which was unknown or could not be recalled.

On the other hand, we repeat, appellant does not give a single reason to support that the alleged confession was false or involuntary, nor does he affirm that he had sufficient evidence to prove its involuntariness.

Although we condemn the prosecuting attorney's conduct in allowing the press to publish details of the confession made before him by defendant, and in allowing that photographs be taken of the actual signing of said confession, and in making an investigation in the presence of reporters and press photographers and of persons alien to the prosecution, we cannot fail to recognize the cleanliness, scrupulousness and rectitude of his conduct regarding said confession during the trial. Neither in the exposition of his theory before the jury nor during the examination of his witnesses did he make the slightest mention, allusion or reference to said confession. Furthermore, at the moment when the jury was being impanelled, he objected to defendant showing to the jury the photographs published in the newspaper. He submitted the case to the jury after waiving his principal opening statement, without any comments or arguments whatsoever, relying exclusively on the evidence which he had introduced.

Counsel for the defense, also observed, during the presentation of the evidence and in the course of the cross-examina-

tion, a highly circumspect and prudent conduct with respect to defendant's alleged confession.

If defendant chose not to testify or offer any evidence and submit his case on the prosecuting attorney's evidence, that was the strategic alternative of his own choice. It the evidence presented by The People, the sufficiency of which is not actually questioned, was believed by the jury and considered by the latter sufficient to return a unanimous verdict of guilty, that was an exclusive function of the jury in the selection of which defendant participated. If it finally proved to be a mistaken strategy for defense, defendant cannot complain thereof.

In view of the foregoing, we believe that the nonproduction of the alleged confession did not deprive defendant of a fair and impartial trial.

[■] (h) Appellant's theory that he was forced to abstain from testifying, because if he testified, the prosecuting attorney could contradict him with his confession without first having to prove its voluntariness, thereby depriving him of a fair and impartial trial, is untenable.

The doctrine that a defendant's confession cannot be admitted against him until its voluntariness is proved, is principally based on the provision sanctioned by the Fifth Amendment of the Constitution of the United States and by § 11 of Art. II of our Constitution, to the effect that no one shall be forced to incriminate himself in a criminal case through his own testimony. This fundamental principle may not be violated impunibly, directly or indirectly. It is present at every moment or stage of the prosecution and, particularly, in the period of the presentation of the evidence.

Even when the prosecuting attorney offers the incriminating testimony against defendant not as a confession properly speaking, but as a mere contradictory testimony to rebut defendant's testimony, the prosecuting attorney has the in-

escapable duty to prove first the voluntariness of the alleged contradictory testimony of the defendant.

In *Ladner* v. *State*, decided June 3, 1957 by the Supreme Court of Mississippi, 95 So.2d 468, 470, it was stated:

"The great weight of authority supports the rule that a defendant in a criminal prosecution who is a witness in his own behalf cannot be compelled on cross-examination to testify as to statements made by him out of court which amount to a confession of the crime, unless it first be shown that the confession was voluntary; despite the fact that the evidence is offered by the prosecution not as a confession, but merely as a contradictory statement, for the purpose of impeaching the defendant as a witness in his own behalf. Annotation, 9 A.L.R. 1358; 58 Am. Jur., Witnesses, Par. 773, p. 423; Wharton's Criminal Evidence, 11th Ed., Sec. 605, p. 1010; Ibid., 12th Ed., Sec. 360, p. 68; People v. Hiller, 2 Ill. 2d 323, 118 N.E.2d 11. A small minority of jurisdictions hold to the contrary. Brown v. State, 243 Ala. 529, 10 So.2d 855; State v. Fisher, 108 Mont. 68, 88 P.2d 53; Com. v. Tolliver, 119 Mass. 312.

"This question seems to be a novel one in this jurisdiction. If the minority rule has any merits to justify it, they are not discernible to us. On the contrary, there are compelling reasons to commend the majority rule. The admission of an involuntary confession is a denial of the guarantees of the due process of law. The reasons for excluding as evidence an involuntary confession apply with equal force when the confession is offered for purposes of impeachment. The confession is just as prejudicial and just as incompetent when offered in the one way as in the other. The fact that the defendant takes the stand in his own behalf does not make incompetent evidence admissible against him. In principle the State should not be permitted to make any use whatever of an involuntary confession. To hold otherwise would permit the State to use every confession, however involuntary, whenever the accused takes the stand in his own defense, simply by questioning the accused about it; and if admitted by the accused the statement comes from him, and if he denies it, the State proves it by way of impeachment."

Appellant relies on the decision in *Walder* v. *United States*, 347 U.S. 62. But that case does not support his contention. It was held therein that to impeach the testimony of an officer who upon making an unlawful search and seizure, at a time not related with the case on trial, discovered narcotics in the possession of defendant, was admissible. This testimony was offered for the purpose of challenging the defendant's testimony who had emphatically asserted that he had never dealt in or possessed any narcotics. It was a matter, then, of statements of personal and direct knowledge, although illegally obtained, of the reality of a fact and tending to directly impeach the credibility of an absolute assertion of defendant, in a collateral point of the case.

Despite the great effort made by appellant to place this appeal within the constitutional scope, the truth is that he has lacked the impulse of an effective showing of prejudice or any other improper element, the effects of which really deprived defendant of a fair and impartial trial. This appeal did not even reach the radius of possible common errors due to abuse of discretion in denying a new trial. All the circumstances of the prosecution from and after the filing of the information show that defendant fully enjoyed his constitutional and statutory rights and that his conviction was not the result of any "trial by newspaper" if any such trial did take place at any time. The error charged was not committed.

The judgment of conviction and the order denying a new trial are hereby affirmed.