SHEPHERD ET AL. v. FLORIDA.

No. 420.   Argued March 9, 1951.—Decided April 9, 1951.

*Franklin H. Williams* and *Robert L. Carter* argued the cause for petitioners.   With them on the brief were *Alex Akerman, Jr.* and *Thurgood Marshall.*

*Reeves Bowen,* Assistant Attorney General of Florida, argued the cause for respondent.   With him on the brief were *Richard W. Ervin,* Attorney General, and *Howard S. Bailey,* Assistant Attorney General.

PER CURIAM.

The judgment is reversed.   *Cassell* v. *Texas,* 339 U. S. 282.

_____

MR. JUSTICE JACKSON, whom MR. JUSTICE FRANKFURTER joins, concurring in the result.

On the 16th of July, 1949, a seventeen-year-old white girl in Lake County, Florida, reported that she had been raped, at the point of a pistol, by four Negroes.   Six days later petitioners were indicted and, beginning September 1, were tried for the offense, convicted without recommendation of mercy, and sentenced to death.[1]   The Supreme Court of Florida, in reviewing evidence of guilt,

_____

[1] A recommendation of mercy was made as to defendant Charles Greenlee, a minor, and he does not appeal.   The fourth suspect, Ernest Thomas, was killed resisting arrest.

said, "As we study the testimony, the only question presented here is which set of witnesses would the jury believe, that is, the State's witnesses or the testimony as given by the defendant-appellants." [2]

But prejudicial influences outside the courtroom, becoming all too typical of a highly publicized trial, were brought to bear on this jury with such force that the conclusion is inescapable that these defendants were prejudged as guilty and the trial was but a legal gesture to register a verdict already dictated by the press and the public opinion which it generated.

Newspapers published as a fact, and attributed the information to the sheriff, that these defendants had confessed. No one, including the sheriff, repudiated the story.[3] Witnesses and persons called as jurors said they had read or heard of this statement. However, no confession was offered at the trial. The only rational explanations for its nonproduction in court are that the story was false or that the confession was obtained under circumstances which made it inadmissible or its use inexpedient.[4]

If the prosecutor in the courtroom had told the jury that the accused had confessed but did not offer to prove the confession, the court would undoubtedly have de-

---

[2] 46 So. 2d 880, 885.

[3] An editor, explaining the source of a statement in an article in his paper that all three Negroes had confessed, said: "[T]he information is based on articles in the various daily papers, and personal conversations I had with people generally. . . . [I]f articles appear in those papers that have stood the test two or three days without denial or correction, based on my previous experience as an editor, I assume them to be true. The article you called my attention to appeared to the best of my recollection in a number of daily papers and was not denied for a period of three days. I don't think they were ever denied."

[4] The defense offered, and the court rejected as completely irrelevant and immaterial, evidence of brutal, inhuman beatings of defendants by state officers in whose custody they were held.

clared a mistrial and cited the attorney for contempt. If a confession had been offered in court, the defendant would have had the right to be confronted by the persons who claimed to have witnessed it, to cross-examine them, and to contradict their testimony. If the court had allowed an involuntary confession to be placed before the jury, we would not hesitate to consider it a denial of due process of law and reverse. When such events take place in the courtroom, defendant's counsel can meet them with evidence, arguments, and requests for instructions, and can at least preserve his objections on the record.

But neither counsel nor court can control the admission of evidence if unproven, and probably unprovable, "confessions" are put before the jury by newspapers and radio. Rights of the defendant to be confronted by witnesses against him and to cross-examine them are thereby circumvented. It is hard to imagine a more prejudicial influence than a press release by the officer of the court charged with defendants' custody stating that they had confessed, and here just such a statement, unsworn to, unseen, uncross-examined and uncontradicted, was conveyed by the press to the jury.

This Court has recently gone a long way to disable a trial judge from dealing with press interference with the trial process, *Craig* v. *Harney*, 331 U. S. 367; *Pennekamp* v. *Florida*, 328 U. S. 331; *Bridges* v. *California*, 314 U. S. 252, though it is to be noted that none of these cases involved a trial by jury. And the Court, by strict construction of an Act of Congress, has held not to be contemptuous any kind of interference unless it takes place in the immediate presence of the court, *Nye* v. *United States*, 313 U. S. 33, the last place where a well-calculated obstruction of justice would be attempted. No doubt this trial judge felt helpless to give the accused any real protection against this out-of-court campaign to convict. But if freedoms of press are so abused as to make fair

trial in the locality impossible, the judicial process must be protected by removing the trial to a forum beyond its probable influence. Newspapers, in the enjoyment of their constitutional rights, may not deprive accused persons of their right to fair trial. These convictions, accompanied by such events, do not meet any civilized conception of due process of law. That alone is sufficient, to my mind, to warrant reversal.

But that is not all. Of course, such a crime stirred deep feeling and was exploited to the limit by the press. These defendants were first taken to the county jail of Lake County. A mob gathered and demanded that defendants be turned over to it. By order of court, they were quickly transferred for safekeeping to the state prison, where they remained until about two weeks before the trial. Meanwhile, a mob burned the home of defendant Shepherd's father and mother and two other Negro houses. Negroes were removed from the community to prevent their being lynched. The National Guard was called out on July 17 and 18 and, on July 19, the 116th Field Artillery was summoned from Tampa. The Negroes of the community abandoned their homes and fled.

Every detail of these passion-arousing events was reported by the press under such headlines as, "Night Riders Burn Lake Negro Homes" and "Flames From Negro Homes Light Night Sky in Lake County." These and many other articles were highly prejudicial, including a cartoon published at the time of the grand jury, picturing four electric chairs and headed, "No Compromise—Supreme Penalty."

Counsel for defendants made two motions, one to defer the trial until the passion had died out and the other for a change of venue. These were denied. The Supreme Court of Florida, in affirming the conviction, observed that "The inflamed public sentiment was against the crime

with which the appellants were charged rather than defendants' race." [5]  Such an estimate seems more charitable than realistic, and I cannot agree that the prejudice had subsided at the time of trial.

The trial judge, anxious to assure as fair a trial as possible under the circumstances, was evidently concerned about violence at the trial.  He promulgated special rules which limited the number of visitors to those that could be seated, allowed no one to stand or loiter in hallways, stairways, and parts of the courthouse for thirty minutes before court convened and after it recessed, closed the elevators except to officers of the court or individuals to whom the sheriff gave special permit, required each person entering the courtroom to submit to search, prohibited any person from taking a "valise, satchel, bag, basket, bottle, jar, jug, bucket, package, bundle, or other such item" to the courtroom floor of the courthouse, allowed crutches, canes and walking sticks only after inspection by the sheriff showed them to be necessary aids, prohibited demonstrations of any nature and made various other regulations, all of which the sheriff was charged to enforce and to that end was authorized to employ such number of deputies as might be necessary.  Such precautions, however commendable, show the reaction that the atmosphere which permeated the trial created in the mind of the trial judge.

The situation presented by this record is not different, in essentials, from that which was found a denial of due process in *Moore* v. *Dempsey*, 261 U. S. 86.  Under these circumstances, for the Court to reverse these convictions upon the sole ground that the method of jury selection discriminated against the Negro race, is to stress the trivial and ignore the important.  While this record discloses discrimination which under normal cir-

---

[5] 46 So. 2d at 883.

cumstances might be prejudicial, this trial took place under conditions and was accompanied by events which would deny defendants a fair trial before any kind of jury. I do not see, as a practical matter, how any Negro on the jury would have dared to cause a disagreement or acquittal. The only chance these Negroes had of ac- quittal would have been in the courage and decency of some sturdy and forthright white person of sufficient standing to face and live down the odium among his white neighbors that such a vote, if required, would have brought. To me, the technical question of discrimination in the jury selection has only theoretical importance. The case presents one of the best examples of one of the worst menaces to American justice. It is on that ground that I would reverse.