66 So.2d 288 (1953)
IRVIN
v.
STATE.
Supreme Court of Florida, en Banc.
June 23, 1953.
Rehearing Denied July 27, 1953.
*290 Alex Akerman, Jr., Orlando, Thurgood Marshall, New York City, and Paul C. Perkins, Orlando, and Elwood H. Chilsom, New York City, for appellant.
Richard W. Ervin, Atty. Gen. and Reeves Bowen, Asst. Atty. Gen., for appellee.
THOMAS, Justice.
A judgment convicting the appellant and another of rape was affirmed by this Court. Shepherd v. State, Fla., 46 So.2d 880. On certiorari the Supreme Court of the United States reversed our judgment apparently on the sole ground that there had been discrimination against the Negro race in the selection of the grand jury that returned the indictment, hence that petitioners' rights under the 14th Amendment of the Constitution of the United States had been violated. Shepherd v. State of Florida, 341 U.S. 50, 71 S.Ct. 549, 95 L.Ed. 740.
Upon receipt of the mandate of the Supreme Court of the United States this Court issued its mandate reversing the judgment of conviction and directing the circuit court to grant another trial. A new indictment was then found charging appellant with rape and his trial culminated in a verdict of guilt and a sentence of death.
We are now concerned with an appeal from that adjudication.
At the outset a motion was made on various grounds to transfer the trial from Lake County where it was originally held and where the crime was alleged to have been committed. The judge granted this motion and ordered the appellant tried in the circuit court of Marion County.
When this matter had been settled the appellant was still dissatisfied so he sought a change of venue claiming he was so odious to the citizens of Marion County and the criminal transaction and preceding trial had received so much notoriety in that county that he could not get a fair trial there either. After an extensive examination of numerous witnesses and the presentation of many affidavits, this motion was denied.
Meanwhile there had also been offered in appellant's behalf a motion to suppress certain evidence obtained by officers of the law from the appellant's mother without a search warrant and the ruling on this motion had been deferred until trial of the case in the new location, so, on the eve of the trial, the judge had for consideration and disposition this motion too, and it suffered the same fate as the other.
The cause then proceeded to trial on the merits before the jury of twelve men.
Adverting to the motion for change of venue the appellant first insists that he was deprived of a fair and impartial trial because the court in considering the evidence supporting the plea for a second change of venue, from Marion County to some other place, sustained an objection to testimony of one Dr. Julian L. Woodward about a poll of public opinion taken under *291 his supervision. The matter of changing the site of the trial was one calling for the exercise of a sound judicial discretion and it was to aid the court in this function that appellant attempted to show what the people of Marion County thought about the impending proceeding. Parenthetically, the appellant does not now contend that the evidence he undertook to introduce was irrebuttable but only that it was admissible.
The witness described himself as "A Research Executive with the Elmo Roper Research and Public Opinion Organization" and detailed his wide experience in conducting surveys to determine the attitude of the American people on varied subjects. The original forms of the questions which were to be asked persons in Florida were prepared in New York and were "tested in and around Jacksonville." The general plan of such an operation, as it was described by the witness, is to select the persons to whom the questions are to be propounded and, of course, from the ratio those interviewed bear to the whole population to determine the prevailing thought on the subject. Taken into consideration in planning the survey with which we are now dealing were the percentages of white adult persons, males and females, urban and rural residents.
After preliminary interviewers had tested the first form, in Jacksonville, the form was returned to the New York office of the firm to be revised for subsequent use in Lake County, where the crime was alleged to have been committed, Marion County, the place designated for the second trial, and in Gadsden and Jackson Counties, which are far removed from the other two. The latter two counties were said to have been selected by those in charge of the survey for "statistical reasons".
The arbitrary numbers of 500 white persons in the first two counties and 250 in the last two were selected for the interview and "it was decided" to call on 150 colored persons in Marion County and about the same number in Lake County. It is not clear how many colored persons were chosen for interviews in the two remote counties. Armed with the questions that were eventually adopted, the interviewers under the immediate direction of a field representative then started at random points in urban areas and made visits at every other house in each block. In country districts they evidently undertook to secure interviews equally as general.
The questionnaire contained introductory questions of a general nature about government and the integrity of government officials in the nation and state. These were followed by inquiries about the specific case such as the guilt or innocence of the appellant, the reluctance or timidity of jurors to vote for acquittal. The closing questions were on unrelated subjects.
This witness was followed by the field representative who was in immediate charge of the interviewers but who, himself, heard none of the answers given. The answers were sent to the New York office of the organization for tabulation and the appellant proposed to show by the two witnesses, who were obviously familiar with the general plan but who were patently ignorant of what transpired between questioner and questioned, what the attitude of the people of Marion County was toward the defendant and his impending trial.
We cannot approve this method of determining the likelihood of a defendant's being unable to receive a fair trial in a given community and therefore cannot attribute any abuse of discretion to the rejection by the judge of the proposed testimony. As the appellant points out the establishment of adverse sentiment of such degree as to indicate that the victim of it cannot receive a fair trial is informal and largely based upon hearsay. But the result of the poll taken in this case went far beyond the latitude allowed by the statute and by established procedure. Neither the witness, the one who had general supervision nor the one who served as field representative, pretended even to have made any interviews on which he could base an opinion as to facts which would support an application for change of venue. Any information he could give on the witness stand, would in our opinion, have amounted to hearsay based upon hearsay. Neither of the witnesses had more than vicarious knowledge of what occurred in the interviews. In preparing *292 the questionnaire wholly dissociated subjects were used as an introduction and conclusion of the list of questions propounded. There was no semblance of there having been a voluntary expression of the attitude of the persons interviewed toward the defendant. The first witness explained the purpose of using irrelevant questions, and his explanation seems to us sensible so far as the plan might be used to elicit information about a household product or commodity, but it seems to us that there is a vast difference between that sort of inquiry and a demonstration to the court of some overpowering sentiment that would so penetrate the thought of the community as to indicate that twelve persons of the integrity and character to fit them to serve on juries could not be found who could take a solemn oath to decide a case upon legal evidence, and abide by the obligation.
Not only was such testimony inadmissible but its competency was suspect. We need say no more in this regard than quote the supervisor who said, in reply to questions about the survey conducted by his organization prior to the presidential election in 1948, "in that kind of a survey we were very badly wrong * * *." We think such a survey might as this witness said, indicate the attitude of prospective customers "towards the products of a company," but as it was conducted and attempted to be applied here, it was useless. In no sense did it indicate an aroused public against a prospective defendant in a court of justice.
From the tabulation of the answers acquired, a report had been prepared by the "Research Executive", the witness Woodward. When the judge sustained an objection to the report, the appellant's counsel attempted to introduce the affidavit of the witness to which the report was attached. This was but an effort to place in evidence what had already been rejected and the affidavit did not cure the defective document. The right to introduce affidavits at the hearing did not carry with it the right to present an affidavit that had as its luggage a paper already properly excluded. And, anyway, the ruling on this piece of evidence could have caused the defendant no harm because the affiant was available and could have personally testified to any admissible facts in his affidavit.
On this phase of the appeal, appellant contends also that in all respects error was committed in failing to grant a removal of the case. It had become, so it is argued, a cause celebre of such proportions and steeped in such publicity that it was impossible for justice to prevail in the County of Marion. To gain the point an effort was made to bring into the hearing an unrelated occurrence of violence in far-away Miami and newspaper reports of the trial of two years before. Against the showing made in appellant's behalf, the State introduced numerous witnesses, some of the Negro and some of the white race, from various walks of life, all of whom stated without reservation that the appellant could get a fair and impartial trial in Marion County. Among the colored men who took the stand was a dentist who had lived in the county thirty years and who was a charter member of the National Association for the Advancement of Colored People. He spoke at length and with considerable eloquence about the fine spirit of cooperation and good will that existed between the races in that county, and incidentally, he deplored the survey that had been undertaken by the professional pollsters. Of like effect was testimony given by a physician who had resided there more than twenty years, a clergyman who had lived there a decade and a retired government employee who had lived in the county sixty years, all members of the colored race.
As an illustration of the friendliness of white people for the colored in the community these witnesses told of the recent construction of an elaborate memorial to a colored soldier who had been killed in World War II and of the participation of both races in its dedication.
The testimony, taken as a whole, overwhelmingly supported the view that the appellant could be assured of all of the protection afforded by the law while he faced trial upon the charge lodged against him.
*293 Proof of the kind offered could not be counteracted by the assumption that justice could not prevail simply because the alleged victim belonged to one race and the alleged assaulter to another. If such illogic were to control, the appellant, of course, could not have been tried anywhere in the state.
We think that the facility with which the jury was chosen emphasizes, in retrospect, the soundness of the judge's action. Only fifty odd jurors were required from which to obtain a panel of twelve qualified to try the issue.
We come now to the appellant's challenge of the court's order overruling a motion to suppress certain evidence obtained, by officers, from appellant's mother without search warrant. After the deputy sheriff had arrested the appellant and taken him to jail, he returned to the home of appellant and asked the appellant's mother for the shoes and trousers appellant had worn the night before. Without reluctance she entered the boy's room followed by the officer, secured the clothing and shoes and delivered them to the officer. Such was the testimony of the mother, the only witness for the appellant on this point. The story of the deputy sheriff that upon asking for the articles the mother invited him in and that he accompanied her to the boy's room, was not contradicted. It is insisted that the occurrence amounted to an unlawful search particularly because the room occupied by the appellant was his alone for which he paid his mother a stipulated amount weekly.
We believe that an interpretation of the incident as an unlawful search and seizure would be decidedly overdrawn. From the testimony on the subject, all given by the mother and deputy, we will undertake to reconstruct the transaction. The shoes worn by the appellant at the time of the arrest did not fit the tracks found at the scene of the alleged assault so the deputy sheriff asked the appellant where the shoes were that the appellant was wearing the night before and the appellant volunteered the information that they "were back at the house." The mother testified that when the officer appeared, he did not threaten her or attempt to coerce her. She was asked: "he [the deputy] just politely asked you for the clothes and shoes?" She replied: "Yes, sir, he did, and I got them for him because he was the law."
The present thought that the presence of an officer was ipso facto a show of force or an exercise of coercion seems not to have occurred to the mother at the first trial for in the record of testimony taken then and introduced for the purpose of impeachment on the hearing on the motion to suppress on the eve of the second trial, she said only, in reply to a question suggesting that when requested by "the law" to give something up she would not argue, "I don't argue with nobody." Also she was silent the first time about any room rental being paid her by her son.
It seems to us, zealous as we think we have always been to safeguard one's constitutional right to freedom from unlawful search and seizure, that the underlying facts in this event are devoid of the elements of search or seizure. A person tells an officer that the clothes he had been wearing were at his home. The officer appears there and without more display of authority than his very presence "politely" asks the man's mother for the clothes. She produces them without protest and the officer receives them without any exploration whatever. Such, to us is not conduct proscribed by the constitutional guarantee.
We are impelled to the view that there was no error in denying the motion to suppress.
This brings us to the questions arising from rulings made after the jury was sworn to try the issue joined between the State of Florida and the appellant.
The first witness for the State was the husband of the alleged victim. From his testimony, and from the testimony of his wife which coincided, and neither of which was contradicted, we learn the story of what occurred on the evening of the assault up to the time that the two became separated. They were traveling on a lonely country road about one o'clock in the morning when the motor of their car stopped as they undertook to turn around. Because *294 the battery was weak the motor would not start. While they were seated in the car the appellant and his three companions drove alongside and offered assistance. They pushed the car into the road, then suddenly discontinued their efforts. When the husband joined them at the rear of the car to see what had occurred they suddenly set upon him, beat him into a state of unconsciousness and threw him into a pasture. When he regained his senses, his wife had disappeared. After the wife had been abducted, raped and abandoned by the four men she made her way to a country store and asked the storekeeper first to take her to the place where she had last seen her husband who she thought might be dead; she then changed her mind and asked that she be taken to the police. As they continued their way they met the husband and another man and it was then she first related what had happened.
To the question by the State addressed to the husband, "What did she tell you?" there was an objection by the defendant which the court overruled and he replied simply: "She told me that she had been raped by four negroes." The attorneys seemed agreed on the principle that a woman raped could be shown to have reported the affair to the first person she saw afterward, but the objection was based on the fact that the husband was not the first but the second. The husband was permitted to quote her statement that she had been attacked although she did not tell the storekeeper what had occurred.
From the very nature of such an experience we think her reply to her husband, even in the other's presence, without telling the first man she saw, a virtual if not a total stranger, was entirely natural and that the admission of the testimony did not violate the spirit of the rule. When she went to the store she evidently did so primarily to get in touch with her husband. That she eventually changed her mind and asked to be taken to the police was rational because she did so after the storekeeper had taken her down the road beyond the place where she had last seen her husband and neither he nor the car could be found. In the circumstances either the husband or an officer of the law would have been the appropriate one first to hear of the revolting affair.
The testimony did not refer to a fact that was a part of the res gestae but it served the purpose of rebutting any inference of consent that might have been drawn from silence. Obviously she was making every effort to report the attack and her failure to do so before she could find her husband or failing that locate a police officer could not have rendered the testimony inadmissible.
The attack on the ruling seems to be two-fold for the appellant's attorney reminds us that although testimony may be received about outcry by the victim of a rape, the details of the assault may not be related. It is insisted on appellant's behalf that this rule, too, was transgressed when the husband's companion was allowed to quote the wife as saying that her legs were injured and bleeding, her clothes torn, and that she was "all messed up and dirty * * *."
We do not find that the rule against admitting testimony about the details of the criminal attack was violated by this testimony because she had already told how she had scratched her knees while fleeing through the woods after she was abandoned, and how she had run into a barbed wire fence. This information and her very appearance justified the admission of the testimony. None of the information amounted to narration of the criminal assault, save only the single statement that she had been ravished and this was quite proper.
The appellant was aggrieved by refusal of the court to charge the jury that in a case of this kind where no other person was an immediate witness to the rape, the testimony of the prosecutrix should be "rigidly scrutinized". He is not entitled to a ruling on this matter because he did not object to the trial court's action as he was required to do by section 918.10(4), Florida Statutes 1949, and F.S.A., in order to assign the failure as error or ground of appeal. Consequently, we feel no obligation to discuss or decide this question.
Counsel for the appellant asked a deputy sheriff on cross-examination whether *295 it was true that the appellant had accused him and the sheriff of attempting to murder the appellant and the court promptly sustained an objection to the question. True, much latitude is allowed a cross-examiner of witnesses but the permissible scope of cross-examination is not so far-flung as to include a question of this type. While it was intended, ostensibly, to show hostility of the witness, it would have elicited testimony about acts that induced antagonism and, worse, testimony by which the one who fomented the hostility would benefit from his own act. In other words, if such procedure were approved, a defendant could make an accusation, however idle, against a prospective adverse witness, then use his own charge, even if wholly unfounded, to his advantage.
In the progress of the trial the state attorney asked a witness for the defendant, the person whom the wife first saw after the assault, whether he had experienced any difficulty with the sheriff's office, to which, over objection by the defendant, the witness replied in the negative. Later the state called the sheriff of Lake County to the stand as a rebuttal witness but the defendants successfully prevented him from testifying on the ground that all witnesses had been excluded from the courtroom while the sheriff had been present during the trial. When the testimony was concluded and the case was being argued, the state attorney told the jury he had undertaken to prove that the defense witness had a grudge against the law enforcement agencies of the county but that "he [counsel for the defendant] stopped me from proving it ". The court denied a motion for mistrial because of this incident and denied also a motion to instruct the jury to disregard these remarks of the state attorney. We think this procedure was irregular; that the remark should not have been made, and having been, the court should have instructed the jury to disregard it. But we cannot ascribe to the error such importance as to justify a reversal.
The relationship between the witness and the sheriff and other law enforcement officers was at its best collateral, and the substance of the witness's testimony when considered with the other evidence in the case, was not so valuable that proof that he bore a grudge against the peace officers would have affected the whole in any appreciable degree. The witness said that the woman told him her husband had been beaten and that she had been kidnapped but made no mention of having been ravished. This witness's testimony corresponded in all essential details with the testimony of the woman except that part where he quoted her once as saying she could not identify her abductors and once as saying "she didn't think she could * * *" but in the record there is much proof that the woman repeatedly recognized the appellant, as early as the day following the incident, when she pointed him out in a police lineup, and as late as the day of the actual trial. The appellant was also positively identified by the husband as one of the four men who had battered him before making away with his wife. Two officers of the Florida Highway Patrol besides a deputy sheriff were with the husband when the appellant was apprehended and the husband became so enraged at the sight of the appellant that he had to be restrained and the deputy thought it necessary to warn him that if he did not control himself he would be handcuffed. This happened when two other colored men were present. Not only do these parts of the record minimize to the point of insignificance the remark of the state attorney and the reference to ill feeling between the witness and the officers, but the question asked the sheriff itself becomes equally unimportant when considered in the context of the record. He had been preceded by two witnesses who were questioned about their length of residence in Lake County, their acquaintance with the man who had first seen the woman and taken her to her husband, and the reputation of this man for truth and veracity. The sheriff followed them to the witness stand and he was allowed to say he was "pretty well" acquainted with the people of Lake County, then he was halted by the objection when the next question had reached this incompleted form: "Now, Sheriff, I want to ask you ".
*296 This may have been the basis for the remark of the state attorney, but to us, and we feel certain to the jury, it was only an attempt to introduce a third witness to impeach the testimony of the defense witness because of his bad reputation for veracity.
A trial of this magnitude and duration cannot be expected to be a pure procedural gem. Procedure is designed to funnel into the proper channel intelligence which human beings have of an incident so that the truth may be established and fundamental rights of persons affected may be at all times protected. But procedure should not be a fetish and we should not commit ourselves to procedure for procedure's sake. If there has been any deviation from the proper path, the question immediately arises whether the digression was of such consequences as to have endangered fundamental rights. That is the reason for our "harmless error" statute providing that, "No judgment shall be * * * reversed * * * by any court of the State of Florida in any cause, civil or criminal, on the ground of * * * improper admission or rejection of evidence or for error as to any matter of * * * procedure, unless in the opinion of the court * * * after an examination of the entire case it shall appear that the error complained of has resulted in a miscarriage of justice." Section 54.23, Florida Statutes 1949 and F.S.A. The statute concludes with the admonition that it "shall be liberally construed."
When all the evidence in this voluminous record is considered independently, and then in connection with the remark of the state attorney, the irregularity which we have mentioned fades into insignificance.
A proper answer to the next question must depend on a study of the evidence with reference to tracks made by shoes and automobile tires at the scene of the assault on the husband and the abduction of the wife. Plaster casts of the prints were prepared but they seem to have become shattered after the first trial. In the second trial a deputy sheriff was permitted to say that he had placed the shoes known to have been worn by the appellant the night of the assault in the depressions and that the shoes fitted the tracks. He told of certain characteristics of the shoes that were reproduced in the prints. After the witness had explained how he had taken the shoes to the place where the tracks appeared, he was asked: "How did they compare?" When the objection to this question was overruled, and he was permitted to show that they corresponded, he answered in the affirmative to the next question: "They compared exactly?" He then went into detail about the comparison and concluded with the assertion that the shoes worn by the defendant made the tracks. Of like effect was his testimony about comparing the imprints of the tires with the tires on the car driven by the appellant and his companions. As we understand the appellant's argument here he is insisting that the judgment should be reversed because the witness was allowed to state, after relating what he did by way of comparison, that in his opinion the imprints were made by appellant's shoes and by the car in which the appellant was riding. We find no reversible error in this procedure. Alford v. State, 47 Fla. 1, 36 So. 436. We do not think it would be logical to hold that in the circumstances a witness could say that in his comparison of shoes and tires with the tracks, he found at the scene, the imprints bore precisely the same characteristic marks as the objects, but that reversible error would result from his stating the conclusion based on these observations that the objects made these imprints.
Lastly, the appellant challenges the action of the trial judge in refusing a charge that the case had become notorious, engendering much excitement and that the jurors should, therefore, be cautious about letting public sentiment influence them in determination of the verdict the evidence warranted. Not only, as the attorney general insists, was there no proper objection to the court's refusal to give the charge but it is shown in the record that the judge warned the jury that in considering the *297 evidence and fixing the verdict they should "not be swayed or influenced by any bias or prejudice, sympathy, or regard, but [should] give both the State and the defendant a fair and impartial consideration of the law [charged] and the evidence admitted." This, we think, was a fair and ample guide on the aspect of extraneous influence, especially when taken with the other charges given to the jury.
The sufficiency of the evidence to establish the commission of rape is not questioned. Even so we have meticulously perused all of the evidence as we feel obligated to do under section 924.32(2), Florida Statutes 1949, and F.S.A., "to determine if the interests of justice require a new trial * * *." We are impelled to say that they do not.
No reversible error appearing the judgment is 
Affirmed.
ROBERTS, C.J., and TERRELL, SEBRING, MATHEWS and DREW, JJ., concur.
HOBSON, J., dissents.
HOBSON, Justice (dissenting).
I am forced to dissent from the majority opinion of affirmance because I believe that the trial judge committed error in refusing to instruct the jury to disregard the improper remark made to it by the state attorney. Indeed, the majority opinion recognized the fact that the judge's denial of the motion to instruct the jury to disregard said remarks constituted error but the conclusion is reached in said opinion that the error was harmless. It is my view that the harmless error statute or rule should not apply in a first degree murder case where the verdict is one of guilt without recommendation for mercy. For a more complete discussion of the writer's convictions upon this subject see his dissenting opinion in North v. State, Fla., 65 So.2d 77-101.