**STATE of Missouri, Respondent,**

v.

**Charles Harvey ODOM, Appellant.**

**No. 49294.**

Supreme Court of Missouri,

En Banc.

July 8, 1963.

Edward G. Farmer, Jr., Joplin, Richard M. Webster, Carthage, for appellant.

Thomas F. Eagleton, Atty. Gen., Howard L. McFadden, Asst. Atty. Gen., Jefferson City, for respondent.

DALTON, Judge.

Defendant was charged and convicted of the offense of forcible rape of a thirteen-year-old female child in Jasper County, Missouri, committed on the 23rd day of July, 1961. The jury assessed his punishment at death. See Sec. 559.260 RSMo 1959, V.A.M.S. Motion for a new trial was filed and overruled and the cause appealed to this court.

At the time of defendant's arraignment in the circuit court he entered a plea of not guilty. Thereafter, and before trial, defendant was permitted to change his plea so that "under his plea of not guilty the defendant asserts an affirmative defense that defendant was insane at the time the offense charged was committed." No evidence of insanity, so as to constitute a defense to a criminal charge, was offered at the trial.

Defendant was represented throughout the trial and on this appeal by eminent trial counsel appointed by the trial court. Defendant was permitted to appeal as a poor person and he has been furnished with a free transcript of the record. The cause has been briefed and argued on appeal. No issue is presented here with reference to the qualifications of the panel of thirty jurors from which panel the twelve were selected to try the case, or to the information, the jury's verdict, the admission or exclusion of evidence, the sufficiency of the evidence, the giving or refusal of instructions, the conduct of opposing counsel or the argument of counsel to the jury.

Error is assigned on the court's refusal to grant a change of venue from Jasper County to Lawrence County on either the first or second motions therefor, the failure to grant additional time to produce an additional witness, the absence of funds to prepare a defense and the discharge of prospective jurors (veniremen) opposed to the imposition of the death penalty in any case.

On Sunday, July 23, 1961, shortly after four o'clock in the afternoon, Lisa Schuh,

a female child thirteen years of age, a resident of Wichita, Kansas, who was visiting her grandmother in Joplin, took her little puppy out for a walk around the block where her grandmother lived. At that time Vernon Stephens was inside a garage painting about a window which faced on an alley in the rear of 731 Potter Street. Another workman was on the roof of the garage. Stephens saw the defendant, Charles Harvey Odom age 29, a resident of Wellington, Kansas, driving a two-tone, white over blue, 1956 Chevrolet automobile, Kansas License No. S/U1–0204, stop his car in the alley opposite the window where Stephens was working. Stephens was able to get a clear view of defendant's head and face and first observed him talking to Lisa Schuh, who had stopped by the car. Stephens could hear little of the conversation, but he saw defendant get out of the car, hold a gun on the child, force her into the car, grab the little dog and throw him in and drive away in haste, holding a gun on the child. Stephens ran out of the garage in time to take the license number of the car, get its make and description and to have these facts reported to the police. The workman on the roof of the garage also saw the child walking through the alley with defendant driving his car by her side. He also observed the child huddled on the floor board of defendant's automobile as it went down Eighth Street.

Shortly after the news was broadcast defendant's auto was seen a short distance north and west of the city limits of Joplin, where two girls had seen the car pass and were able to see the driver. Defendant's automobile had also been observed parked in a narrow roadway in this northwest area obstructing the passage of other vehicles. The driver of another automobile had caused defendant to back his car up for some distance to permit this other car to pass defendant's car. Subsequently, defendant's car operated by defendant was observed heading back into Joplin at a high speed. It was followed into the city by a police officer in an unmarked car. This officer caused defendant's car to be stopped and defendant to be arrested at an intersection with Seventh Street, almost within the same area and approximately within an hour from the time the child was picked up.

The arresting officer observed the handle of a pistol sticking out from under the front seat of defendant's car and on the floor of the car, in back of the driver's seat, the officer found the child's bloody clothing and the shoes the child was wearing when she left her grandmother's home. The officer also found a rock with blood and hair on it and some of defendant's own clothing. When asked where the child was, defendant denied any knowledge of her. Search was then instituted in the area where defendant's car had been seen northwest of the city. In a secluded and desolate area in heavy brush the little dog was first located and then the unconscious and almost naked child was discovered. She was taken to a hospital where she remained unconscious for approximately six weeks. Medical examination revealed that she had had sexual intercourse and her private parts severely injured and, in addition, she had been struck on the head and her skull fractured in several places and brain tissues exposed. Witnesses identified defendant as the driver of the car in the alley where the child was seized, also as the driver of the car when it was parked northwest of the city and also as it was leaving the city and returning to it.

Statements signed by the defendant on July 26, 1961, were admitted in evidence. They showed that defendant admitted putting a pistol in the window of the car with the barrel pointing out the window towards the little girl; that the girl got into the car; that after a lapse of time, they arrived at a secluded area where he proceeded to have sexual intercourse with the child; that he probably told her to remove her clothes; that, after he had completed having intercourse with her, he was very frightened to realize what he had done; that, when he had left Springfield that afternoon he had on brown slacks, brown slippers, brown

socks, a white T-shirt and a gold sweater, but when he was arrested he had on jeans, brown slippers, brown socks, a white T-shirt and a gold sweater; that he had used the rock found in his car to beat the child on the head; that he must have put the girl's clothes in the car; that he intended to get rid of the clothes later; that, when a certain car passed him on the road and he saw a woman in the car, he tried to think of some way to get rid of the child; that he remembered picking up a rock and hitting her on the head and seeing her sort of crumple on the ground; that he hit her several times more while she was lying on her side on the ground; and that, thereafter, he hurriedly picked up her clothes, the rock and other articles, put them in the car and left the scene. Defendant did not testify at the trial.

A careful reading of the entire record in this case shows that the State's case was so overwhelming on the issue of guilt that eminent counsel representing the defendant offered no testimony in an attempt to refute it. Counsel did cross-examine one of the State's witnesses at length after the witness had testified as to defendant's mental condition and his knowledge of the difference between right and wrong. Defendant's mother was also offered as a witness for defendant and she testified that defendant was delivered by the use of instruments which left marks on his head and caused one eye to appear smaller than the other. She also reviewed his early life and the extreme poverty of the family, told how he had been shifted among relatives and friends and said that when still a child he had tried to kill himself when he was disappointed and failed to receive an expected gift at Christmas time.

In his statement to the jury after the State had concluded its case, the Honorable Richard M. Webster, one of defendant's counsel, addressed the jury as follows: "I believe you have deduced from the positions we have taken so far * * * that there has been no strenuous activity on the part of Mr. Farmer and I to present evidence

to you and there will not be, that Lisa Schuh was not attacked and raped on the 23rd day of July. There has been no evidence and there will not be [sic] that this act was not done by Charles Harvey Odom, because as I have been trying to say, our obligation is to present to you the facts and contrary to what public opinion may be, no lawyer has an obligation to attempt to fabricate a case, and that is the last thing that Mr. Farmer or I or any attorney that I know would attempt to do. But, we feel that the facts as they are, should have a great weight with you in the penalty that you assess if you find that this man is in fact guilty, and it should have a great weight in your deliberation. * * * Now, we are going to present a very brief defense which is merely background information supporting the findings which were given to you by the State's own witness, Dr. Wilson, with regard to the mental condition of this man. * * *

"We feel that in your determination of a sentence that those are facts which we [sic] will eventually have to consider, if you find this man guilty, and we feel that we should provide you with additional information about this man so that you can weigh the evidence that you have before you in the light of the person involved. * * *"

In his closing argument to the jury, the defendant's said counsel recognized that the State's evidence was clear and convincing when he said: " * * * in this case we have a senseless, an unexplainable crime. A crime in which there was no malice. A crime in which we had a man whose mind was demented from a legal standpoint. He knew the difference between right and wrong. But, from the ability to control his actions, from the ability to explain his actions, there is a vast difference. You have seen these exhibits, they have been paraded back and forth before you. They are rather sickening. I can understand the emotions that are felt by this mother of this little girl. I can understand the emotions that I am certain are felt by the members of this jury. But, the only question in this case with regard to the mitigation or penalty is

the question of the capacity of this man to control or account for his actions even though from a strictly legal standpoint he knew the difference between right and wrong. Ed Farmer pointed out yesterday in his interrogations of the witnesses that at all times after the crime was committed, at all times these exhibits, this rock and these clothes, all of the other exhibits, were in plain sight. A man was riding around the streets of Joplin an hour after he was seen leaving the scene of the crime. Riding, not away from the crime, but back toward the place where he picked up this little girl. Unaccountable? Unexplainable? I think that Officer Hickman had the right answer when Ed Farmer asked him, 'Would any man in his right mind carry a rock, old milk cans and all of the clothing right in the open?' And, his answer was, 'In my opinion, no.' And, you remember in the confession, when he was asked why, asked by the police, 'Why did you do this?' Because, of course, they are interested, too, in the man's mentality. And, his answer was, 'I don't know, I guess I wanted to be caught.' Because, you see, this man understands the damage that he's done. This man made the statement to the police and I'll tell you frankly, he's made it to me. 'I wanted to be caught.'"

Did the court err in denying defendant's first application for a change of venue from Jasper County?

On October 5, 1961, defendant presented his motion for a change of venue wherein he asked the court to "enter its order granting a change of venue in this cause *to the County of Lawrence, Missouri, which is a county adjoining this county in which this cause is now pending* and for such other and further relief as to the Court may seem just and proper in the premises." (Italics ours.)

The grounds stated in the motion were:

"2. That the circumstances surrounding the crime for which the defendant is charged were given much notoriety, and many stories have been printed in the newspapers in Jasper County concerning the crime together with photographs of the scene and the parties allegedly connected therewith.

"3. That the other news media in the County of Jasper and in particular the television news media have carried long and complete accounts on their programs concerning the defendant and the crime for which the defendant is accused including pictures of the alleged details of this charge.

"4. That a civic organization in Joplin, Missouri, has solicited funds for the aid of the complaining witness and that the inhabitants of Jasper County have contributed over Three Thousand Dollars to said fund and have therefore become directly involved in the outcome of any trial held in this county."

The conclusions sought to be drawn from these alleged facts were that:

"By reason of such notoriety, all of the inhabitants of Jasper County have become acquainted with the matters here in issue through sources outside this Court and have become prejudiced thereby and that the minds of the inhabitants of Jasper County are so prejudiced against this defendant that a fair trial cannot be had therein." The motion was accompanied by two supporting affidavits.

Section 545.490 RSMo 1959, V.A.M.S., under which the application for change of venue was presented reads, in part, as follows:

"The petition of the applicant for a change of venue shall set forth the facts or grounds upon which such change is sought, and such petition shall be supported by the affidavit of petitioner and the affidavit of at least two credible disinterested citizens of the county where said cause is pending and *the truth of the allegations thereof shall be proved, to the satisfaction of the court, by legal and competent evidence,* and the prosecuting attorney may in such case offer evidence in rebuttal of that submitted in support of such application * * *." (Italics ours.)

On October 16, 1961, a hearing was held on the motion for change of venue to Lawrence County and defendant offered some thirteen witnesses, including defendant's two court-appointed counsel, who testified in support of the motion. This evidence tended to show that upon the arrest of defendant a representative of the local TV station immediately took a number of photographs showing the location where the child was found, and including a picture of defendant being fingerprinted, a picture showing a gun sticking out from under the front seat of defendant's car at the time of his arrest, and a picture of the rock and the child's clothing. When these photographs were shown on TV they were accompanied by identifying script. The evidence further tended to show that the local newspapers, The Joplin Globe, which had an average circulation of 31,000, the Joplin News Herald, which had an average circulation of 12,000, and the Carthage Evening Press, which had an average circulation of 6,600, carried factual reports with reference to the happenings on July 23, 1961, and defendant's confession on July 26. Copies of news articles were offered in evidence and there was testimony tending to show that these articles were not slanted against defendant, but merely gave a review of the facts in the manner that other news articles appeared. The same or similar factual information was given by radio and TV stations.

In addition to the various news articles, the evidence showed that a civic club started a movement to raise funds for medical attention for the injured child. A letter was sent to the newspapers, radio and TV stations stating that funds could be sent to the First National Bank in order to provide necessary medical and hospital care. The parties raising this fund had no interest in defendant or in his prosecution. They were interested in the injured child and in furnishing her the necessary medical help. Donations came to the fund from all over Kansas, Arkansas, Oklahoma and the whole southwest section of Missouri, including Jasper County. In none of the letters accompanying the donations was the defendant even mentioned. There was also evidence that two ladies had conducted a three-day rummage sale in Joplin to raise money for medical treatment and hospitalization of the injured child; they solicited merchants for goods, including cakes, pies and bakery goods, all of which were sold at the sale. People came from all over the county and adjoining counties and even from Arkansas to purchase goods at the sale. A total of $4,242.39 was collected for the mentioned purposes, $800 of which came from the sale of rummage. The smallest contribution to the fund was thirty-five cents. A report on the progress of collections for the fund was announced over the TV stations three times a week for some fourteen months. The fund was referred to as the "Lisa Schuh Fund." No money was used or intended to be used in any way connected with the prosecution of the defendant.

Except for the full publicity given in news media immediately following defendant's arrest, and the reports of his confession a few days later, the offense as such, and defendant's connection with it, had little publicity from that time until the case was set for trial. There was evidence that some people hadn't even heard of the case while others assumed from the facts reported, including the confession, that defendant was guilty, or had or would plead guilty. A few news articles referred to defendant as the "confessed attacker." The testimony indicated that some people were fully "sold" on the facts reported at the time of defendant's arrest and by his subsequent confession. A few persons had heard opinions expressed that defendant was guilty, and others could not understand why it was necessary to appoint counsel for defendant. Most of the news items about the case had appeared within a few days after the first newspaper, radio and TV reports. There was evidence from which the court could find that, thereafter, the news reports had soon "died down."

The representative of the TV station who took and collected the pictures for use im-

mediately after defendant's arrest said that the case involved the "3 S's, sex, sadism and slaughter," and that such a case usually increased the numbers of the listening and viewing audience on TV. There was testimony that none of the news articles contained anything to indicate that defendant would not be afforded a fair trial, and that they did not seek to influence the outcome of defendant's trial, nor to designate or recommend any particular punishment.

The attorneys appointed to represent defendant, both well-known and capable members of the Bar, testified that they had interviewed some two to three hundred people in the county; that the case had received more publicity than any other; and that many had drawn the conclusion from the facts stated in the various newspaper reports and other news media that there was no doubt of defendant's guilt. The attorney also testified that it was very difficult, if not impossible, to get people to testify on defendant's behalf; however, there was no evidence presented tending to show that any of the persons so contacted knew of any facts that would help defendant, or that any of the people contacted would not have testified if they had been in possession of facts tending to show defendant not guilty, or entitled to a change of venue. The people generally who talked to either of the attorneys assumed defendant's guilt from the facts reported. Both attorneys said they had talked to people from all over the county in an effort to discover whether bias and prejudice existed and that they felt that it did; and that defendant could not have a fair trial because of the facts reported by the news media.

There was no testimony tending to show that there were any meetings or suggestions of mob violence or any concerted action in any way to influence the results of a court trial. Many people discussed the welfare of the child and the progress she was making in the hospital, but the case against defendant was not discussed as much as one would reasonably expect in

view of the facts attending defendant's timely arrest and his confession.

■ The State offered some twelve witnesses in rebuttal, many of them coming from small towns and communities out over the county outside the limits of either Joplin or Carthage. Some of them had heard no comments at all with reference to the case and many of them had heard no comments indicating bias or prejudice against defendant. What little discussion they had heard was at the time defendant was arrested and gave his confession. Some didn't even know of money being collected for the "Lisa Schuh Fund." One had not heard of defendant's confession. The witnesses offered by the State included the probate judge of the county residing in Central City, an implement and hardware dealer, a garage operator, a banker in Sarcoxie, a grocery merchant, an implement dealer at Avilla, a banker from Jasper, a furniture dealer at Webb City, a banker from Carthage, a druggist from Carthage, an automobile dealer and the postmaster at Jasper. We take judicial notice of the fact that Jasper County had a population of 78,863 in 1960.

It will be noted that defendant requested a change of venue from Jasper County to *Lawrence County*. There was no evidence offered tending to show that the mentioned newspapers did not circulate as widely in Lawrence County and in other adjoining counties as in Jasper County, or that the people in Lawrence County did not receive the same information given by the newspaper, radio and TV reports that the citizens of Jasper County received. There was no evidence tending to show that conditions were any different in Lawrence County from what they were in Jasper County and, of course, the court takes judicial notice that the information given by newspaper, radio and TV stations does not terminate at county lines. In any case, the trial judge heard and saw all of the witnesses and could judge of their credibility and the weight and value of their

testimony far better than this court can on this appeal. Except for the testimony of counsel designated by the court to defend the defendant, there was little factual evidence given by the witnesses which would tend to show the existence of bias and prejudice of the inhabitants of Jasper County against defendant, or to show facts which would prevent defendant having as fair a trial in Jasper County as in any other county of the state. This is not a case where the news media was seeking to press the prosecution or to demand a particular verdict or punishment, or to influence the subsequent trial in any manner. Generally, they reported the news factually, while the news media *in the aggregate gave much information at the time of defendant's arrest and when his confession was announced,* still there was no evidence tending to show that anyone in the county read or heard *all* of the reports by *all* the papers and *all* of the radio and TV stations in the county.

■ Appellant's counsel recognize that under Missouri decisions "newspaper publicity alone is not grounds for a Change of Venue." They concede that "bias and prejudice is not an objective thing but a subjective state of mind." They admit that "they had an extremely difficult position when they attempted to produce witnesses for their position"; and that "They were then forced to rely upon the evidence of radio, newspapers and television comment." This fact accounts for their further contention that "the objective evidence which was introduced, namely the newspaper clippings, the television transcripts, the pictures, and the deposit slips from the Lisa Schuh fund, *established prejudice without a doubt.*" (Italics ours.) However, we do not agree, but think the existence of bias and prejudice was not shown by the evidence. In any event its existence, if any, was a fact issue for the court under all of the evidence, and the court denied defendant's application for a change of venue. The court did not err in overruling this application for a change of

venue to Lawrence County, or to any other county. In this day and time, a case of this type is sure to be quite as fully reported by the newspapers, TV and radio stations throughout the state as it would be in the local county where the alleged offense occurred. No error or abuse of discretion appears from this record. State v. Pierson, 331 Mo. 636, 56 S.W.2d 120, 121 [1-4]; State v. Messino, 325 Mo. 743, 30 S.W.2d 750, 757; State v. May, 172 Mo. 630, 72 S.W. 918, 922. Also see State v. Londe, 345 Mo. 185, 132 S.W.2d 501, 502 [1, 2, 3], (where, as here, there was no objection to the panel of thirty jurors selected and the court had been most liberal in excusing veniremen who were not fully qualified); and see State v. Anderson, 252 Mo. 83, 158 S.W. 817, 822 [10] [11] [12] (where no denial or excuse for the crime was presented and the only defense was defendant's previous good character). Under the facts in each case the court held there was no abuse of discretion in refusing to grant a change of venue.

Appellant has cited Janko v. United States, 366 U.S. 716, 81 S.Ct. 1662, 6 L.Ed. 2d 846, where the court reversed an opinion of the United States Circuit Court of Appeals, reported in 8 Cir., 281 F.2d 156. The ground for reversal does not appear in the Per Curiam opinion of the United States Supreme Court. There was a diversity of opinion in the United States Circuit Court of Appeals for the 8th Circuit on certain issues in the case; however, there was no diversity of opinion as to the absence of prejudice from newspaper publicity at the time of the trial. It appears from the Circuit Court of Appeals' opinion that no member of the jury trying the case had read the article in the St. Louis paper that appeared while the trial was in progress. The Circuit Court of Appeals held that, on the record, no prejudice to the defendant could possibly have resulted from the presence of the newspaper articles in question. It further pointed out that, "Some element of practicality and realism in matters of this kind is still indi-

cated. It is yet the law that the determination of the issue of publicity prejudice remains primarily a matter for the trial court's discretion." And it further quoted from Justice Holmes' comment that, " 'If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day.' " We may not assume that the United States Supreme Court would have reversed the Circuit Court of Appeals on the issue of trial publicity and its effect, absent a showing that any member of the jury had seen or heard or read the article in the St. Louis paper published during the course of the trial. It is true that the article published, if read, would have been highly prejudicial and it would have informed the jurors of matters that could not have been shown in the course of the trial. Such is not the case here.

Other cases cited by appellant include Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250; Stroble v. State of California, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 and Shepherd v. State of Florida, 341 U.S. 50, 71 S.Ct. 549, 95 L.Ed. 740. In the Marshall case two newspapers containing prejudicial and inadmissible information had gotten before a substantial number of the jurors during the course of of the trial and the United States Supreme Court pointed out that: "In the exercise of our supervisory power to formulate and apply proper standards for enforcement of the criminal law in the federal courts * * * we think a new trial should be granted."

In the Stroble case the court held that the record failed to establish that newspaper accounts of a murder, for which defendant was arrested and tried, or newspaper accounts of defendant's confession had aroused against the defendant such prejudice in the community as to necessarily prevent a fair trial; and that the confession, which was one of the most prominent features of the newspaper accounts, was made voluntarily and was introduced into evidence at the trial itself. The judgment of the trial court was affirmed.

In Shepherd v. State of Florida, 341 U. S. 50, 71 S.Ct. 549, 95 L.Ed. 740, prejudicial influences outside the courtroom in a highly publicized trial were brought to bear on the jury with such force that the conclusion was inescapable that the defendants were prejudged as guilty; and that the trial was but a legal gesture to register a verdict already dictated by the press and by public opinion, which the highly inflammatory articles had generated. Further, the published newspaper article represented as a fact that the defendants had confessed and no one repudiated that statement, and no evidence of a confession was offered at the trial.

In Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751, the jury selected in the trial court included eight persons who on voir dire examination had expressed their opinion as to defendant's guilt of the crime which had had extensive newspaper, radio and television coverage preceding the trial. It was held that an impartial trial could not be had and the conviction for murder was void. The cases cited do not rule the issues here presented.

No question of publicity at or immediately before the trial appears in this case and no error is assigned as to the qualifications of the panel of thirty jurors from which the twelve were selected to hear the case.

Appellant next contends that "the Court erred in failing to grant the defendant a Change of Venue from Jasper County, Missouri, at the time a second motion was made at the close of the voir dire examination." The record in this case shows that only one written application was made for a change of venue, as hereinbefore referred to, but at the close of the voir dire examination and after the final selection of the panel of thirty qualified jurors, one of defendant's counsel made the following statement: "In view of the questions as propounded by the State and the answers

from the witnesses on voir dire examination pertaining to the knowledge and information that they had pertaining to the crime, in view of the fact that of the sixty-four prospective jurors who were questioned, each of them stated that they did have information pertaining to the crime. The defense at this time renews it's motion for a change of venue from the County of Jasper." The court refused the request.

While all of the sixty-four prospective jurors brought into court had heard of the case at about the time of its alleged occurrence and knew of the existence of such a case through newspaper, TV or radio reports, none of the sixty-four had talked to any witnesses in the case nor had they discussed the facts with anyone purporting to know the facts of the case. Of the total number summoned for jury duty *some twenty were disqualified as being opposed to the death penalty* and some of these were also disqualified on the ground of having formed an opinion from the newspaper, radio or TV reports. Among the sixty-four were a few jurors who were well acquainted with some members of the child's family and had formed an opinion. There is no suggestion here that the panel of thirty jurors was not fully qualified to hear the case. It was from this list that twelve were selected to try the cause.

In Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, cited by appellant the court said: "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

For the reasons hereinbefore stated, the court did not err in refusing appellant's motion for a change of venue orally renewed at the close of the voir dire examination. See State v. Lehman, 182 Mo. 424, 81 S.W. 1118, 1123, 66 L.R.A. 490.

Appellant further contends that: "The court erred in failing to grant the defendant an additional thirty minutes in which to produce the testimony of an additional witness." The witness was not named in the request, in the motion for a new trial, or here. The record presented shows that, at 9 a. m. on November 9, 1961, defendant's counsel, Edward G. Farmer, Jr., advised the court as follows: "At this time the defendant makes the request that this matter be continued, at least an hour or a half hour, to enable the defendant's counsel to converse with two witnesses. It was called to the defendant's counsel's attention at eight o'clock this morning that there were two people who lived in Bell Center, the vicinity of this alleged crime, who were witnesses to the fact that the car was being driven by Lisa Schuh rather than by the defendant. This evidence tends to discredit testimony by the prosecutor's witnesses that the defendant was seen driving the car, and it might further be said, that the defendant's counsel did not have an opportunity to interview these two witnesses before the trial was taken up again before the Court ordered the matter to commence."

The record further shows:

"THE COURT: Well, the Court has waited from 9:00 A.M. until 9:40 A.M., and apparently the parties have not arrived and the request will be refused."

Counsel then stated that the sheriff's department had notified the people and directed them to appear. The court then said: " * * * let the record show that

the subpoenas have been issued and the parties were called on the telephone by the sheriff. The Court does not feel that the testimony would be such as to make any material difference in the defense of the defendant."

█ It is apparent that no written request was made for a continuance, no affidavit was filed as to what either witness would say. They had not been interviewed by counsel, nor had either witness been personally served with a subpoena. No showing was made that the alleged witnesses or either of them intended to appear by reason of the telephone messages, nor was it shown that the witnesses intended to or did appear in court within any reasonable time. The indicated testimony did not bear on the guilt or innocence of the defendant, nor on the issue of punishment, and defendant could not have been prejudiced by the court's ruling. Clearly, the matter was within the court's discretion and no abuse of this discretion appears from this record. Further, in view of the manner in which the cause was tried and the admissions of counsel, the absence of such evidence was not prejudicial to the defendant. See State v. Scott, Mo.Sup., 338 S.W.2d 873, 876; State v. Gaddy, Mo. Sup., 261 S.W.2d 65, 68[5].

Appellant further contends that, "the defendant was not adequately represented because neither the defendant nor his counsel were provided with any funds with which to prepare the defense, obtain psychiatric examination for the defendant, or obtain expert testimony with regard to the defendant's mental condition or capacity." This issue was first presented to the court in the motion for a new trial which was filed on December 8, 1961, subsequent to the verdict of the jury, which verdict was returned into court on November 9, 1961. The only place that the matter is even mentioned in this record, other than in the motion for a new trial, was in the opening statement of defendant's counsel after the State had closed its case. In that state-

ment Mr. Webster said to the jury: "As you know, Mr. Farmer and I were appointed to defend Mr. Odom. That has a special significance, because when an attorney is appointed to defend, that occurs when you are defending a man totally and completely without funds and it means, of course, that your attorney is serving totally and completely without funds."

█ The record fails to show that counsel at any time indicated to the court that funds were needed to prepare the defense, obtain psychiatric examination or expert testimony with regard to defendant's mental condition or capacity. No request was made to the court to have defendant sent to any state institution for examination as to his mental condition or capacity. Since the matter was not presented to the court or ruled upon during the course of the trial, or before, nothing is presented for determination by this court at this time.

Appellant further contends that: "The Court erred in discharging for cause all members of the jury panel who stated they were opposed to the giving of the death sentence for reason that the striking for cause of such jurers prevented the selection of a cross section of the population of the county in a case in which a death sentence is not mandatory under the law."

█ During the hearing on voir dire examination the defendant made no objection at any time to the court's action in discharging jurors on the ground that they had indicated that they were opposed to the death penalty. The State had indicated that it would seek such penalty. On several occasions during the examination of the jurors, the State requested the discharge of certain prospective jurors from the panel by reason of their "opposition" to the death penalty. They were discharged on that ground and defendant's counsel made no objection whatsoever at the time to this action by the court. Others were also discharged on the ground that they had indicated that they "didn't believe in

capital punishment." Not having objected at the time, it is, of course, too late at this time for appellant to raise the question sought to be presented. It was several times stated that the State was asking for the death penalty and no objection was raised to that statement. The contention, however, is wholly without merit. See Sec. 546.130 RSMo 1959, V.A.M.S.; State v. Swinburne, Mo.Sup., 324 S.W.2d 746, 751[5].

The judgment is affirmed.

All of the Judges concur except HOLMAN, J., not sitting.